920 P.2d 357

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Marc C. MENDOZA, Defendant–Appellant.**

**No. 17839.**

Supreme Court of Hawai'i.

June 21, 1996.

Catherine H. Remigio, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, on the briefs, Wailuku, Maui, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Defendant–Appellant Marc C. Mendoza appeals from his conviction of unlawful possession of a firearm under Hawai'i Revised Statutes (HRS) § 134–4(b) (1993).[1] Mendoza argues that HRS § 134–4(b) violates his "right to keep and bear arms" under the state and federal constitutions.[2]

## I. BACKGROUND

On March 8, 1993, a member of the Maui Prince Hotel's housekeeping staff recovered a Colt .45 Caliber Government Model pistol from a recently vacated room at the hotel, which had been rented to Mendoza. The police determined that the pistol was not stolen, but that it was registered in Lihue, Kaua'i to someone other than Mendoza. Mendoza later admitted that he had transported the pistol to the hotel from his home and further explained that he purchased the weapon from its registered owner in 1985. Mendoza eventually produced a notarized bill of sale dated March 30, 1993, which alleged that the transfer for value took place in or about spring of 1985. Mendoza acknowledged that he did not acquire a permit for the transaction as required by law. Accordingly, he was charged with the misdemeanor offense of unlawful possession of a firearm.

On January 31, 1994, Mendoza filed a motion to dismiss the amended complaint arguing that HRS § 134–4(b) violates his right to bear arms under the state and federal constitutions. On February 4, 1994, with the

---

1. HRS § 134–4(b) provides that "[n]o person shall possess any firearm that is owned by another, regardless of whether the owner has consented to possession of the firearm, without a permit from the chief of police of the appropriate county, except as provided in subsection (c) and section 134–5." It is undisputed that the exceptions contained in HRS §§ 134–4(c) and 134–5 do not apply in the instant case.

2. As a matter of convenience, we shall utilize the phrase "right to bear arms" in the remainder of this opinion. The state and federal right to bear arms provisions are virtually identical. *Compare* Haw. Const. art. I, § 17 (1978) ("A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."), *with* U.S. Const. amend. II. ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."). HRS § 121–1 (1993) defines the "militia":

§ 121–1 **Militia.** The militia of the State shall consist of every resident able-bodied citizen of the United States who is seventeen years old or older and under forty-six years of age and all other able-bodied residents of that age who have declared their intention to become citizens of the United States. The militia shall be composed of four classes

(1) The federally organized and recognized national guard,
(2) The remainder of the organized militia to be known as the [Hawai'i] state defense force,
(3) The naval militia,
(4) The unorganized militia.

The unorganized militia shall consist of those members of the militia who are not members of the national guard, the naval militia, or the state defense force. The unorganized militia shall be subject to active military duty only when called or ordered into the service of the State for such period as is required. They may be assigned to existing organizations of the [Hawai'i] national guard, the naval militia, or the state defense force, or otherwise as the exigencies may require.

court's permission, Mendoza argued the motion on his own behalf. Nevertheless, the court denied Mendoza's motion:

> Well, Mr. Mendoza, the Court does not agree. The Section in question ... is, in the Court's view, reasonable regulation which does not relate to either the Federal or the State Constitution. The burden that it imposes is a minimum interference with the rights of the citizen, whether the test is a compelling state interest or simply a rational relation, either way I think the State has an interest in ensuring that firearms do not come into the hands of those who lack the capacity or ... have the criminal history which would indicate a very compelling danger to the community.

That same day, Mendoza pled no contest and the court sentenced him to one year probation with the following terms and conditions: 1) thirty days incarceration with mittimus suspended for as long as he complies with the terms of probation; and 2) confiscation of the firearm, stayed pending appeal. The court entered judgment, guilty conviction and sentence on February 7, 1994. On March 4, 1994, the court denied Mendoza's motion for stay of execution of sentence. Mendoza timely filed his notice of appeal on March 7, 1994.

**3.** The permitting requirement is addressed by HRS § 134–2 (1993), which provides in pertinent part that:

> (a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence, or if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section; provided that when title to a firearm is acquired by inheritance or bequest, the foregoing part shall be obtained before taking possession of the firearm.
>
> (b) The permit application form shall include the applicant's name, address, sex, height, weight, date of birth, social security

## II. *STANDARD OF REVIEW*

 "Questions of constitutional law are reviewed under the right/wrong standard of review." *State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995). Moreover, "we have long held that: (1) legislative enactments are presumptively constitutional; (2) a party challenging [a statutory scheme] has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Convention Center Authority v. Anzai*, 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (internal quotation marks omitted).

## III. *DISCUSSION*

Mendoza argues that the circuit court improperly denied his motion to dismiss because: 1) previous cases from other jurisdictions concluding that the second amendment to the United States Constitution (Second Amendment) established a collective right to bear arms are wrongly decided; 2) article I, section 17 of the Hawai'i Constitution establishes an individual, rather than a collective, right to bear arms; and 3) HRS chapter 134, which asks for "extremely personal and confidential information, including privileged information," is not narrowly tailored to satisfy a valid state interest.[3] The prosecution re-

> number, and information regarding the applicant's mental health history and shall require the fingerprinting and photographing of the applicant by the police department of the county of registration; provided that where fingerprints and photograph [sic] are already on file with the department, these may be waived.
>
> (c) An applicant for a permit shall sign a waiver at the time of application, allowing the chief of police of the county issuing the permit access to any records that have a bearing on the mental health of the applicant. The permit application form and the waiver form shall be prescribed by the attorney general and shall be uniform throughout the State.
>
> ....
>
> (e) ... [N]o permit shall be issued to a first time applicant earlier than fourteen calendar days after the date of the application; provided that a permit shall be issued or the application denied before the twentieth day from the date of application. Persons who have previously obtained permits subject to the waiting period required by this subsection and who make a subsequent application within one year of the

sponds that: 1) neither the state nor federal constitutions confer an individual right to bear arms; 2) article I, section 17 of the Hawai'i Constitution permits government registration and regulation of firearms; and 3) HRS chapter 134 is a valid exercise of the State's legitimate police power.

### A.

■ As a preliminary matter, we observe that it is well-settled that the Second Amendment "is a limitation only upon the power of Congress and the National government, and not upon that of the States." *Presser v. Illinois*, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886). *See also United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939); *Miller v. Texas*, 153 U.S. 535, 538, 14 S.Ct. 874, 875, 38 L.Ed. 812 (1894); *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876). In other words, the Second Amendment does not apply to the States through the fourteenth amendment to the United States Constitution (Fourteenth Amendment). *Malloy v. Hogan*, 378 U.S. 1, 4 n. 2, 84 S.Ct. 1489, 1491 n. 2, 12 L.Ed.2d 653 (1964) (citing, inter alia, *Presser* and *Cruikshank*). *Compare Gideon v. Wainwright*, 372 U.S. 335, 345–47, 83 S.Ct. 792, 797–98, 9 L.Ed.2d 799 (1963) (Douglas, J., concurring) (observing that "ten justices

issue date of the first permit may be issued permits in less than fourteen days.
*See also* HRS § 134–7 (1993) (enumerating classes of persons who are disqualified from possessing or owning firearms, including: fugitives from justice; persons under indictment for or convicted of felonies, crimes of violence, or the illegal sale of any drug; drug addicts and alcoholics; persons who have been committed or are under treatment for mental disorders; and persons under restraining orders).

4. We are aware of the multitude of scholarly opinions in recent years challenging the Court's interpretation of the Second Amendment. *See, e.g.*, David B. Kopel, Clayton E. Kramer, and Scott G. Hattrup, "A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts," 68 Temple L.Rev. 1177, 1177–79 n.2 (1995) ("Virtually all of the scholarship of the last 20 years concurs that the Second Amendment was originally intended to guarantee an individual right." (Citations omitted.)). However, we are without power to overrule the Court's longstanding interpretation of the Second Amendment. As recently as sixteen years ago, the Court cited *Miller, supra*, for the proposition that "the

have felt that it [i.e., the Fourteenth Amendment] protects from infringement by the States the privileges, protections, and safeguards granted by the Bill of Rights" but conceding that this view "has never commanded a Court").[4] Thus, we hold that Mendoza cannot claim that State firearms regulations infringe upon any rights protected by the Second Amendment.

■ Notwithstanding the fact that article I, section 17 of the Hawai'i Constitution is virtually identical to the Second Amendment, we recognize our ability to extend greater protection to defendants than provided under the federal constitution. *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996) (citing *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967)). Accordingly, we must now examine the constitutional right accorded by this state to keep and bear arms.

### B.

The proper construction of article I, section 17 is a question of first impression. Forty-two other state constitutions contain provisions providing a "right to bear arms." Hawai'i is one of only five states whose provisions track the language of the Second Amendment.[5] *See* Alaska Const. art. I,

Second Amendment guarantees no right to keep and bear a firearm that does not have some reasonable relationship to the preservation or efficiency of a well regulated militia." *Lewis v. United States*, 445 U.S. 55, 65–66 n. 8, 100 S.Ct. 915, 921 n. 8, 63 L.Ed.2d 198 (1980) (internal quotation marks omitted).

5. *Compare* Ala. Const. art. I, § 26; Ariz. Const. art. II, § 26; Ark. Const. art. II, § 5; Colo. Const. art. II, § 13; Conn. Const. art. I, § 15 (1965); Del. Const. art. I, § 20 (1987); Fla. Const. art. I, § 8(a) (1968); Ga. Const. art. I, § 1, ¶ 8 (1983); Idaho Const. art. I, § 11 (1978); Ind. Const. art. I, § 32; Ill. Const. art. I, § 22 (1970); Kan. Const. Bill of Rights, § 4; Ky. Const. Bill of Rights § 1, ¶ 7; La. Const. art. I, § 11 (1974); Me. Const. art. I, § 16 (1987); Mass. Const. Part the First, art. xvii; Mich. Const. art. I, § 6 (1963); Miss. Const. art. III, § 12 (1890); Mo. Const. art. I, § 23 (1945); Mont. Const. art. II, § 12 (1972); Neb. Const. art. I, § 1 (1988); Nev. Const. art. I, § 11(1) (1982); N.H. Const. art. Part First, art. 2–a (1982); N.M. Const. art. II, § 6 (1986); N.D. Const. art. I, § 1 (1984); Ohio Const. art. I,

§ 19 ("A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."); N.C. Const. art. I, § 30 (1875); S.C. Const. art. I, § 20 (1971); Va. Const. art. I, § 13.[6] Among the four states with constitutions that track the language of the Second Amendment, it appears that only the North Carolina appellate courts have rendered judicial opinions construing the right to bear arms under its state constitution. *See, e.g., State v. Fennell,* 95 N.C.App. 140, 382 S.E.2d 231 (1989).

In *Fennell,* the Court of Appeals of North Carolina affirmed the defendant's conviction of possessing a weapon of mass death and destruction—*viz.,* a sawed-off shotgun. The court rejected the defendant's argument that the state could only regulate firearms as to time, place or manner. Citing the North Carolina supreme court, the court of appeals observed that:

> [i]t is ... a reasonable regulation ... to require that a pistol shall not be under a certain length, which, if reasonable, will prevent the use of pistols of small size, which are not borne as arms, but which are easily and ordinarily carried concealed. To exclude all pistols, however, is not a regulation, but a prohibition, of arms, which come under the designation of

§ 4 (1851); Okla. Const. art. II, § 26; Or. Const. art. I, § 27; Pa. Const. art. I, § 21 (1968); R.I. Const. art. I, § 22; S.D. Const. art. VI, § 24; Tenn. Const. art. I, § 26 (1870); Tex. Const. art. I, § 23; Utah Const. art. I, § 6 (1984); Vt. Const. ch. I, art. 16; Wash. Const. art. I, § 24; W. Va. Const. art. III, § 22 (1986); Wyo. Const. art. I, § 24.

As of 1995, seven states did not have a constitutional provision affording residents a right to bear arms—*viz.,* California, Iowa, Maryland, Minnesota, New Jersey, New York, and Wisconsin.

**6.** Article I, § 30 of the North Carolina Constitution provides:

> A well regulated militia being necessary to the security of a free State, *the right of the people to keep and bear arms shall not be infringed;* and, as standing armies in time of peace are dangerous to liberty, they shall not be maintained, and the military shall be kept under strict subordination to, and governed by, the civil power. *Nothing herein shall justify the*

"arms" to which the people are entitled to bear.

*Id.* 382 S.E.2d at 233 (quoting *State v. Kerner,* 181 N.C. 574, 107 S.E. 222, 225 (1921)). In *Kerner,* the court had indicated that:

> [t]he historical use of pistols as "arms" of offense and defense is beyond controversy.
>
> . . . .
>
> We know that in the past this privilege [i.e., the constitutional right to bear arms] was guaranteed for the sacred purpose of enabling the people to protect themselves against invasion of their liberties. Had not the people of the Colonies been accustomed to bear arms, and acquire effective skill in their use, the scene at Lexington in 1775 would have had a different result, and when "the embattled farmers fired the shot that was heard around the world," it would have been fired in vain. . . .
>
> . . . .
>
> The maintenance of the right to bear arms is a most essential one to every free people and should not be whittled down by technical constructions. It should be construed to include all "arms" as were in common use, and borne by the people as such when this provision was adopted. It does not guarantee on the one hand that the people have the futile right to use submarines and cannon of 100 miles range nor airplanes dropping deadly bombs, nor

*practice of carrying concealed weapons, or prevent the General Assembly from enacting penal statutes against that practice.*

(Emphases added.) Article I, section 20 of the South Carolina Constitution provides:

> A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed. As, in time of peace, armies are dangerous to liberty, they shall not be maintained without the consent of the General Assembly. The military power of the State shall always be held in subordination to the civil authority and be governed by it.

Article I, section 13 of the Virginia Constitution provides:

> That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state, therefore, the right of the people to keep and bear arms shall not be infringed; that standing armies, in time of peace, should be avoided as dangerous to liberty; and that in all cases the military should be in strict subordination to, and governed by, the civil power.

148

the use of poisonous gases, nor on the other hand does it embrace dirks, daggers, slung-shots and brass knuckles, which may be weapons but are not strictly speaking "arms" borne by the people at large, and which are generally carried concealed. *The practical and safe construction is that which must have been in the minds of those who framed our organic law.* The intention was to embrace the "arms," an acquaintance with whose use was necessary for their protection against the usurpation of illegal power—such as rifles, muskets, shotguns, swords, and pistols. These are now but little used in war; still they are such weapons that they or their like can still be considered as "arms," to which they have a right to "bear."

107 S.E. at 224–25 (emphasis added). *See also Nunn v. Georgia,* 1 Ga. 243 (1846) (holding that the right to bear arms under the North Carolina constitution is both a collective and an individual right).

This state's constitutional provision originated with Proposal Number 3, section 15 (hereinafter "Section 15") as introduced in the Constitutional Convention of Hawai'i of 1950. II Proceedings of the Constitutional Convention of Hawaii of 1950, at 10 (1961) (hereinafter "1950 CON–CON Proc. II"). The prosecution argues that "[t]he Constitutional Convention of [Hawai'i] of 1968 specifically addressed the scope of the right to bear arms and concluded that it was a collective, not an individual right." A standing committee report provided:

> Section 15 is retained by your Committee without amendment. The Committee feels that reference must be made to the report of the 1950 Constitutional Convention that the people of this State not misconstrue the intent of this section. The right to bear arms refers explicitly to the militia and is subject to lawful regulation.

Stand. Comm. Rep. No. 55 (Majority), *in* I Proceedings of the Constitutional Convention

7. *See, e.g.,* Legislative Reference Bureau, *Hawaii Constitutional Convention Studies, Article I: Bill of Rights* 10–13 & 139 nn. 16–31 (July 1968).

The proceedings of the 1950 [Hawai'i] constitutional convention clearly indicate that the delegates intended to incorporate the Second Amendment and understood that amendment

of 1968, at 235 (1972) (hereinafter "1968 CON–CON Proc. I"). Moreover, Delegate Larson indicated her belief that the right to bear arms provision needed to be clarified:

> In 1950, contrary to the committee report, *there was some confusion in the minds of the delegates as to whether this particular section referred to the individual's right to bear arms or to the collective right of the militia or the national guard to be armed.* The Legislative Reference Bureau studies indicate that there was such confusion in the minds of the delegates....[7]

> I'd like to make it clear for the record that this provision through a series of Supreme Court cases over the last thirty or forty years historically and through such court cases means that *the individual does not have the right to bear arms necessarily, that this section refers to ... the collective right of the militia to bear arms.*

> Now, why am I concerned with bringing out this point today to this committee? Mr. Chairman, I think for the purposes of dispelling the illusion and perhaps for the purposes of clearing this for the delegates to this Convention, and also to the people of our State, *Section 15, the so-called "right to bear arms" provision, does not refer to the individual's right, it refers to the militia, to the national guard.* Thank you.

II Proceedings of the Constitutional Convention of 1968, at 24 (1972) (emphases added). The Convention did not take any formal action pursuant to Delegate Larson's remarks and, consequently, retained Section 15 without amendment.

During the debates of the Committee of the Whole in 1950, a colloquy between the Chairman and delegates Phillips and Mizuha indicated their understanding that Section 15 provided an individual right to bear arms:

> as permitting the regulation of firearms by the legislature. However, there is also evidence which indicates that the delegates thought that Section 15 was guaranteeing an individual right to keep arms.
> *Id.* at 12 (footnotes omitted) (citing 1950 CON–CON Proc. II, at 11).

PHILLIPS: I'd like to ask the chairman of the committee a question. When you say "people" do you mean all the people or do you mean each individual in a state?

MIZUHA: Well, I believe it applies to all persons here in the territory.

PHILLIPS: To each individual or to them as a group?

MIZUHA: I did not understand the question.

PHILLIPS: Well, you say, well, "the militia," and then the—after the comma, "the right of the people to keep and bear arms." Do you mean there the right of the individual or the right of the—

CHAIRMAN: The individual; the individual right.

PHILLIPS:—of all individuals?

MIZUHA: All individuals.

PHILLIPS: All individuals.

CHAIRMAN: Individual rights, the Constitution is for individuals. . . .

1950 CON–CON Proc. II, at 11. *See also id.* at 14 (Delegate Fukushima expressed his belief that Section 15 would ensure the right of non-citizens to bear arms for sportsmanship, subject to reasonable restrictions). After the Chairman announced that Section 15 received unanimous approval, Delegate Gilliland rose to register an objection: "I think there should be some modification . . . [indicating] whether or not everybody has a right or only members of the national guard have the right or who shall have the right to go

around armed." *Id.* at 12. Delegate Sakakihara then moved that action on Section 15 be deferred because it was unclear whether existing firearms registration laws violated the Second Amendment.[8] *Id.* at 12–13. The Chairman ruled that Section 15 had already been adopted, so Sakakihara made a motion for reconsideration seconded by Delegate Phillips. *Id.* at 13. This motion failed. *Id.*

The Convention proceeded to adopt two other constitutional provisions and then reopened discussion on Section 15 pursuant to a motion for reconsideration made by Delegate Anthony seconded by Sakakihara. *Id.* at 13–14. During the ensuing discussion, delegates Anthony and Nielsen made statements that arguably could be construed to reflect their belief that Section 15 only established a collective right to bear arms. *Id.* at 14. *But see id.* at 14 (Nielsen also stated, "I think it's only right that American citizens, *the same as in all the other states* in the Union, should be able to own a shotgun or a rifle, and if they want to carry it, certainly they have to get a permit.") (emphasis added). Delegate Bryan countered by suggesting that "the law-abiding citizens of this territory are entitled to have firearms for their own protection, for sportsmanship, for target practice and so forth." *Id.* At the end of the discussion, the Convention adopted Section 15 by voice vote. *Id.* at 15.

Whether Section 15 established a collective right to bear arms, an individual right, or both,[9] it is evident that the framers were

8. Presumably, Sakakihara was referring to Revised Laws of Hawai'i (1945) § 7183, at 896–97, which was amended twice prior to the 1950 Constitutional Convention. *See* 1949 Haw. Sess. L. Act 192, at 459–60; 1949 Haw. Sess. Laws (Sp.Sess.) Act 24, at 51–52 (adding provisions to allow the loaning of registered firearms to others for hunting, target or skeet shooting). Section 7183 remained on the books, as renumbered and with amendments, until repealed by the legislature in 1988. 1988 Haw. Sess. L. Act 275, § 4 at 517 (repealing HRS § 134–3 (1985), "Permits to acquire; penalty"). In the same act, the legislature added what is now HRS § 134–2 (1993) ("Permits to acquire."). *Id.* § 2 at 511–12. As amended pursuant to Act 24 of the 1992 special legislative session, section 7183 provided in pertinent part: "[f]urther, no person shall keep in his possession any such firearm which is owned by another, irrespective of whether or not said owner has consented to such possession, without

a *permit* from the chief of police of the aforesaid county[.]" (Emphasis added.)

9. Although we do not decide the question, we observe that interpreting article I, section 17 to guarantee both a collective and an individual right to bear arms, subject to the State's police power, would be consistent with the vast majority of cases construing the right to bear arms under other state constitutions. *See, e.g., Sklar v. Byrne,* 727 F.2d 633, 637 (7th Cir.1984) (discussing the Illinois Constitution); *Bristow v. State,* 418 So.2d 927, 930 (Ala.Cr.App.), *cert. denied* (Ala.1982); *Dano v. Collins,* 166 Ariz. 322, 802 P.2d 1021, 1022–23 (Ct.App.1990), *review denied,* 167 Ariz. 535, 809 P.2d 960 (1991); *Fife v. State,* 31 Ark. 455, 460 (1876); *Rabbitt v. Leonard,* 36 Conn.Supp. 108, 413 A.2d 489, 490 (1979); *Rinzler v. Carson,* 262 So.2d 661, 665–66 (Fla.1972); *Landers v. State,* 250 Ga. 501, 299 S.E.2d 707, 709 (1983); *Carson v. State,* 241 Ga. 622, 247

concerned about the potential impact that the proposed constitutional provision would have on existing firearms registration laws or the state's ability to enact other reasonable restrictions. For example, two committee reports concerning this provision reveal the intent to allow legislation providing for reasonable restrictions on the right to bear arms.

> Section 15 incorporates the 2nd Amendment of the Federal Constitution. In adopting this language, it was the intention of the committee that the language should not be construed as to prevent the state legislature from passing legislation imposing reasonable restrictions upon the right of the people to keep and bear arms.

Stand. Comm. Rep. No. 20, *in* I Proceedings of the Constitutional Convention of [Hawai'i] of 1950, at 164 (hereinafter "1950 CON–CON Proc. I").

> This section incorporates the 2nd Amendment to the Federal Constitution. Your Committee wishes to make it clear that this section will not render invalid the existing laws of the Territory, which will be continued in effect by the State Constitution, relating to the registration, possession and carrying of firearms, nor will it prevent the legislature from passing other reasonable restrictions on the right to acquire, keep or bear firearms or other weapons, including the power of the legislature to entirely prohibit the possession of such modern and excessively lethal weapons as machine guns, silencers, bombs, atomic weapons, etc. Upon this understanding, your Committee recommends the adoption of this section.

Committee of the Whole Rep. No. 5, *in* 1950 CON–CON Proc. I, at 303. These sentiments are also reflected in the debates of the Committee of the Whole:

> TAVARES: ... This is a provision that I object to very violently. *I think it's utterly unnecessary, and I have not yet been shown satisfactory authorities to the effect that under this provision we can regulate with safety or we can be sure that our present laws on regulating firearms will be valid.* ...
>
> ....
>
> TAVARES: This is a serious question. It's not—it is of great moment. We have on our books today a law requiring registration of firearms. I have asked a question. *I am not sure that the provision as now worded will permit our legislature or will—to continue such a law in effect or will not render that law unconstitutional.* I have been shown some authorities which are not conclusive. And I think it's well worth considering, because I think that is a very proper and necessary law.
>
> MIZUHA: I believe the delegate from the fourth district has raised a good point. I would like to read from the committee report on Section 15. "Section 15 incor-

S.E.2d 68, 72 (1978); *State v. Grob,* 107 Idaho 496, 690 P.2d 951, 953–54 (Ct.App.1984); *Matthews v. State,* 237 Ind. 677, 148 N.E.2d 334, 338 (1958); *Kalodimos v. Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 315, 470 N.E.2d 266, 273 (1984); *Eary v. Commonwealth,* 659 S.W.2d 198, 200 (Ky.1983); *State v. Hamlin,* 497 So.2d 1369, 1371 (La.1986); *Hilly v. City of Portland,* 582 A.2d 1213, 1215 (Me.1990); *Eaton County Deputy Sheriffs Ass'n v. Smith,* 37 Mich.App. 427, 195 N.W.2d 12, 13 (1972); *People v. Brown,* 253 Mich. 537, 235 N.W. 245, 246 (1931); *State v. LaChapelle,* 234 Neb. 458, 451 N.W.2d 689, 690–91 (1990); *State v. Smith,* 132 N.H. 756, 571 A.2d 279, 280–81 (1990); *State v. Dees,* 100 N.M. 252, 669 P.2d 261, 263 (Ct.App.1983); *State v. Fennell,* 95 N.C.App. 140, 382 S.E.2d 231, 233 (1989); *State v. Ricehill,* 415 N.W.2d 481, 483 (N.D.1987); *Arnold v. Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163, 172 (1993); *Ex Parte Thomas,* 21 Okla. 770, 1 Okla.Crim. 210, 97 P. 260, 262 (1908); *State v. Cartwright,* 246 Or. 120, 418 P.2d 822, 829 (1966), *cert. denied,* 386 U.S. 937, 87 S.Ct. 961, 17 L.Ed.2d 810 (1967); *Commonwealth v. Ray,* 218 Pa.Super. 72, 272 A.2d 275, 279, *vacated on other grounds,* 448 Pa. 307, 292 A.2d 410 (1972); *Ford v. State,* 868 S.W.2d 875, 878, *reh'g denied* (Tex.Crim.App.1994); *State v. Beorchia,* 530 P.2d 813, 814–15 (Utah 1974); *State v. Duranleau,* 128 Vt. 206, 260 A.2d 383, 386 (1969); *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571, 596–97 & n. 9 (1984); *In re Metheney,* 182 W.Va. 722, 391 S.E.2d 635, 638 (1990); *State v. McAdams,* 714 P.2d 1236, 1237–38 (Wyo. 1986). *Contra Junction City v. Lee,* 216 Kan. 495, 532 P.2d 1292, 1295 (1975) (citing *Salina v. Blaksley,* 72 Kan. 230, 83 P. 619, 620 (1905)); *Commonwealth v. Davis,* 369 Mass. 886, 343 N.E.2d 847, 849 (1976) (holding that the right to bear arms under the Massachusetts constitution was not intended to be "directed to guaranteeing individual ownership or possession of weapons").

porates the Second Amendment of the Federal Constitution. In adopting this language it was the intention of the committee that the language should not be construed as to prevent the State legislature from passing legislation imposing reasonable restrictions on the right of the people to keep and bear arms." The committee had before it representatives of various clubs, rifle clubs, gun clubs and so forth, to express their opinions about the present registration laws of the Territory. It had before it the representatives of the Honolulu Police Department, the Attorney General's office, and the City and County Prosecutor's Office. And after careful deliberation on the subject, it felt that *this provision in the State Constitution would not prevent the State legislature from passing reasonable restrictions on the right to keep and bear arms.*

ANTHONY: I think that the chairman of the committee is correct in that. In the case of *Robertson v. Baldwin,* 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715—that arose under the Federal Constitution, and an act of Congress had prohibited the carrying of concealed weapons—that was upheld as not an abridgement of the Second Amendment and I think there are many other authorities.

I think the only thing the delegate from the fourth district wants to do is wants to have sufficient time to look into the question, and satisfy himself, which I think we all should do. We shouldn't hurry this through until we are satisfied that it is a correct application of the law.

. . . .

TAVARES: . . . It's my understanding that under this interpretation then, which we are to be considered as acting upon, . . . if this provision is approved *the legislature can by law provide for a registration act such as we have today, at least in substance.*

MIZUHA: That is correct. It was the understanding of the committee.

. . . .

ANTHONY: The State of Massachusetts has an elaborate statute regulating the carrying of weapons, arms. . . . Under that [state's] constitutional provision, the Massachusetts General Court for years has maintained one of the most up-to-date statutes in regard to the registration and the carrying of firearms. I don't think there's any danger in that regard.

TAVARES: Well, Mr. Chairman, some of the authorities I have looked at say that the provision of the Federal Constitution and of many state constitutions was to be read in the light of conditions existing at the time the constitution was adopted. . . . Today, is the word arms going to be considered that way or are we going to consider arms as machine guns and everything else? We don't—*we want to have our legislature empowered to prohibit entirely the possession of machine guns, except by government officials, police, and so forth. We want them to be able to prohibit entirely the possession of atomic weapons, and various other things.* And that should be made very clear here, because it's not clear in the report as to what the word "arms" means. Does it mean we can only regulate the possession of atomic weapons or machine guns, or does it mean that we can utterly prohibit those? That is not clear, and *I would like to make it very clear if we vote on it that we have the right to prohibit entirely the use of that type of lethal weapons.*

BRYAN: I think it would clarify the record a little bit. As I recall in the committee when we discussed this, it was pointed out that there is a federal regulation concerning automatic weapons and things of that nature that you spoke of. Also, that *the committee felt in passing this that the present method of regulation would be allowed, if the legislature so desired.* Is that correct, Mr. Chairman?

MIZUHA: That is correct.

. . . .

HEEN: . . . *In other words, you may have the right to bear arms, but that is not an absolute right, that right may be regulated by, say, the enactment of legislation prohibiting the keeping of machine guns, automatic rifles, and so forth.*

CHAIRMAN: Tear gas.

TAVARES: If I am—if I get an answer from the chairman of that committee that that is so and we are acting on that understanding, I will vote for the measure....

MIZUHA: That is my understanding.

....

SAKAKIHARA: During the 1949 session of the legislature a bill was sponsored by the Police Department of the City and County of Honolulu to regulate the possession of firearms and a method of registration of the same. Discussion was held in the Judiciary Committee of the House, finally the law was enacted. Subsequent to the enactment of the law, a judge of the court of record of this Territory made public statement in a public assembly holding that law to be unconstitutional, invalid, because it was in violation of Amendment Two of the United States Constitution, holding that the right of the people to keep and bear arms has been infringed.

Question of that nature was brought before the committee. Nevertheless, the Committee of the—Judiciary Committee of the House felt in the interest of public welfare and a protection to the public from denying irresponsible people from bearing arms or having firearms in possession enacted such law as the law of this Territory. It now dawns on me whether that question may not come before the courts of this Territory, any federal law to the contrary notwithstanding....

....

ANTHONY: ... It seems to me that with the ills of society such as there are today, interstate crime and local crime and machine guns and things of that nature, *the legislature should be free, within reasonable limits, to pass legislation on that and this is not going to basically infringe anybody's civil liberties.* If I want to keep a rifle or a shot gun, all I have to do is go down to the police station and register it. Our legislature is not going to be silly enough to pass a law that'll prevent these duck shooters from carrying their shotguns around or anything else that is reasonable and proper. But *it would afford complete legislative scope.*

....

NIELSEN: I take exception with—to some of the statements that have been made.... [Y]ou don't just go down and get the gun registered. The—most policemen believe that they're the only ones that had—should own a gun of any kind, and no one else should have any. And the proof that this is wrong is the fact that you have to go down and get a permit, subject yourself to cross-examination as to where you're going to use this weapon, what you want to use it for, and everything else; then you have to go to the dealer, present this permit to get it, then you take it back down and it's registered. Then, until the last session, if you loaned it to a man, why, it could be taken over by the game warden or anyone else. There's all kinds of restrictions that are not reasonable.

....

In addition to that, what happened in Czechoslovakia. The registration cards were all in the box, and when the communists moved in the first thing they grabbed was the registration of all the guns, and went out and took them away from the people, and they couldn't offer any resistance. *I think it's only right that American citizens, the same as in all the other states in the Union, should be able to own a shotgun or a rifle, and if they want to carry it, certainly they have to get a permit. All police regulations are still in effect.*

BRYAN: I'd like to speak briefly on that point. *I think the reason that this is in here is because we don't want to see the legislature pass a law absolutely prohibiting the use or the ownership of firearms by the citizens.* You'll find in history that it is the illegally armed minority that actually we're faced with as far as the trouble is concerned. The legally armed majority are the ones that should have the right to protect themselves and I believe that this provision gives it to them. *I think lacking this it would be entirely possible for the legislature to pass a law saying that there should be no firearms in the territory,* and in that case you know who will have them, the people that want to use them for lawbreaking.

I think that the law-abiding citizens of this territory are entitled to have firearms for their own protection, for sportsmanship, for target practice and so forth. That's why I would like to see this provision remain. I think that it's been so worded and, with investigation into the court action on similar provisions, it is so worded that the police will not be left with their hands tied on this subject. *Regulation can be imposed.*

. . . .

FUKUSHIMA: I'd like to speak to the retention of Section 15, also. There is this danger that we must observe. By including in our Constitution such a section, Section 15 will protect all the people from keeping and bearing arms, subject of course to reasonable restrictions. If we did not have such a section in, the legislature can very well go ahead and discriminate non-citizens from citizens. This has been attempted many and many a time. In fact in the last session of the legislature such a bill was introduced and after it was called to their attention that perhaps it may be unconstitutional, by the attorney general's office, then the bill was amended to include all persons. I feel that all aliens, all persons, regardless of whether they're citizens or aliens, should be entitled to bear arms if it is under a reasonable restriction and it it's used for sportsmanship. They desire the same type of sport as a citizen, and to prevent the legislature from enacting any type of bill of that nature, I feel that Section 15 should be well included in our Constitution.

1950 CON–CON Proc. II, at 10–15 (emphases added).

■ In light of the foregoing excerpts and committee reports from the 1950 constitutional convention, it is unnecessary for us to decide whether the framers intended to establish an individual or collective right to bear arms under article I, section 17. *Cf. Robertson v. City and County of Denver,* 874 P.2d 325 (Colo.1994).[10] Assuming, without deciding, that article I, section 17 established an individual right to bear arms, we believe that Mendoza's claim that HRS chapter 134 must be subjected to strict scrutiny is without merit.

In *Robertson,* the Colorado Supreme Court reversed a portion of the trial court's decision concluding that the State's Constitution guarantees the people a "fundamental" right to bear arms and applying strict scrutiny to an ordinance banning the manufacture, sale, or possession of assault weapons.

> While it is clear that this right is an important constitutional right, it is equally clear that this case does not require us to determine whether that right is fundamental. On several occasions, we have considered article I, section 13, yet we have never found it necessary to decide the status accorded that right. Rather, we have consistently concluded that the state may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable.

874 P.2d at 328. *Cf. Arnold,* 616 N.E.2d at 171 (holding that the right to bear arms is fundamental but, nevertheless, subject to the reasonable exercise of Ohio's police power); *Rabbitt,* 413 A.2d at 491 (holding that the right to bear arms is a fundamental right that must be protected by procedural due process). The court, in *Robertson,* held that it was error for the trial court to review the ordinance under the strict scrutiny standard and to ask whether it was supported by a compelling state interest and narrowly tailored to meet that interest. 874 P.2d at 331. *See also Sklar,* 727 F.2d at 637 ("[s]ince the state constitutional right is narrowly circumscribed by the police power, the fact that the Chicago ordinance as a whole affects the right does not trigger compelling state inter-

---

**10.** The court, in *Robertson,* suggested that Colorado's constitutional right to bear arms—*viz.,* "The right of no person to keep and bear arms in defense of his home, person, and property . . . shall be called in question; but nothing herein shall be construed to justify the practice of carrying concealed weapons." Colo. Const. art. I, § 13—is broader than ours. 874 P.2d at 328 n.

6. Notwithstanding the Colorado Supreme Court's contention that our constitution "ha[s] been construed merely to guarantee the collective or 'state's right' to bear arms for the maintenance of the militia[,]" *id.,* we reiterate that no binding authority exists construing article I, section 17 of the Hawai'i Constitution.

est analysis of the ordinance"); *Kalodimos,* 83 Ill.Dec. at 319–20, 470 N.E.2d at 277–78 (applying the rational basis test to an ordinance prohibiting the possession of handguns on the grounds that "the right to bear arms secured by the Illinois Constitution, ... is subject to substantial infringement in the exercise of the police power even though it operates on the individual level").

■ We agree with the Colorado Supreme Court's analysis in *Robertson.* Accordingly, we hold that the right to bear arms may be regulated by the state in a reasonable manner. "It is often said that the police power is one of the least limitable of governmental powers. It is inherent in the sovereign, and all rights are possessed subject to it." *W.H. Greenwell, Ltd. v. Land Dept.,* 50 Haw. 207, 209, 436 P.2d 527, 528–29 (1968) (citations omitted). The appropriate inquiry is whether HRS chapter 134 bears a rational relationship to a legitimate government interest. *Cf. Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 242–43, 104 S.Ct. 2321, 2330–31, 81 L.Ed.2d 186 (1984) (applying the same inquiry to this State's Land Reform Act of 1967).

The legislative history accompanying a 1992 amendment to the existing permit system demonstrates the legislature's continuing concern for public safety:

> [A] longer waiting period is necessary to properly conduct background checks into the applicant's psychological, medical and criminal history—all or which are *necessary to determine the fitness of the permit applicant.* Extending the waiting period will give the police enough time to conduct an adequate investigation and obtain responses to inquiries sent to physicians, psychologists and psychiatrists.
>
> ....
>
> ... [T]he additional inconvenience of a four-day extension is outweighed by the *need to insure that only appropriate persons are allowed to secure firearms.*

Sen. Stand. Comm. Rep. No. 2483, in 1992 Senate Journal, at 1118 (emphases added).

> This period is used to conduct a series of background checks into the applicant's psychological, medical, and criminal history. These checks help determine the fitness of the applicant to own a firearm in

the State of [Hawai'i]. ... This additional time would contribute to the police department's ability to insure that only law abiding, physically able, and psychologically stable citizens of this State are allowed to own or possess firearms.

Hse. Stand. Comm. Rep. No. 63–69, in 1992 House Journal, at 920. We believe that requiring a person to obtain a permit under HRS § 134–2 prior to acquiring a firearm is rationally related to the legitimate government interest of ensuring that only those who are mature, law abiding, competent citizens possess firearms.

We observe further that Mendoza cites no authority to support his assertion that requiring firearm permit applicants to provide their social security numbers, mental health histories, and fingerprints amounts to an unreasonable restriction of the constitutional right to bear arms. Thus, we hold that Mendoza has failed to meet his burden of showing unconstitutionality beyond a reasonable doubt. *See Convention Center,* 78 Hawai'i at 162, 890 P.2d at 1202.

### IV. CONCLUSION

For the foregoing reasons, we affirm Mendoza's conviction of the offense of unlawful possession of a firearm without a permit.

LEVINSON, Justice, concurring.

I concur in the judgment of the court.

In his opening brief, Mendoza asserts a single point of error on appeal:

> The [circuit] court erred in denying ... Mendoza's [m]otion to [d]ismiss [the] [a]mended [c]omplaint. ...
>
> Article I, [s]ection 17 of the [Hawai'i] State Constitution and the [s]econd [a]mendment [to] the Federal Constitution secure the right of individuals to keep and bear arms and provide that such right "shall not be infringed." ... As applied to ... Mendoza, [Hawai'i] Revised Statutes (HRS) [§ ] 134–4(b) constitutes an infringement of the right to bear arms because it requires that ... Mendoza obtain a permit prior to purchasing/possessing a firearm. In order to apply for a permit,

... Mendoza would be required, under HRS § 134–2, to reveal extremely personal and confidential information, including privileged information.

Thus, Mendoza's appeal raises only one narrow question for resolution: Does the application of HRS § 134–4(b) (1993) to Mendoza infringe upon any rights secured either by the second amendment to the United States Constitution or by article I, section 17 of the Hawai'i Constitution? The simple answer is "no." Inasmuch as (1) article I, section 17 "incorporates the 2nd Amendment to the Federal Constitution," *see* Committee of the Whole Rep. No. 5, *reprinted in* I Proceedings of the Constitutional Convention of Hawai'i of 1950, at 303; *see also* Stand. Comm. Rep. No. 20, *reprinted in id.* at 164, and (2) HRS § 134–4(b) has no " 'reasonable rela-

tionship to the preservation or efficiency of a well regulated militia,' " *see Lewis v. United States,* 445 U.S. 55, 65–66 n.8, 100 S.Ct. 915, 921 n.8, 63 L.Ed.2d 198 (1980) (quoting *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939)), I would hold that HRS § 314–4(b), as applied to Mendoza, in no way infringes upon rights secured by the second amendment to the United States Constitution and article I, section 17 of the Hawai'i Constitution.