*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCAP-22-0000561
07-FEB-2024
09:05 AM
Dkt. 49 OP

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Plaintiff-Appellant,

vs.

CHRISTOPHER L. WILSON,
Defendant-Appellee.

SCAP-22-0000561

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CAAP-22-0000561; CASE NO. 2CPC-17-0000964)

FEBRUARY 7, 2024

RECKTENWALD, C.J., McKENNA, EDDINS, JJ., CIRCUIT JUDGE MORIKAWA
AND CIRCUIT JUDGE TOʻOTOʻO, ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY EDDINS, J.

**I.**

Article I, section 17 of the Hawaiʻi Constitution mirrors the Second Amendment to the United States Constitution. We read those words differently than the current United States Supreme

Court.  We hold that in Hawai'i there is no state constitutional right to carry a firearm in public.

The State appeals an order dismissing two "place to keep" offenses, Hawai'i Revised Statutes (HRS) § 134-25 (2011) (pistol or revolver) and § 134-27 (2011) (ammunition) filed against Christopher Wilson.  Citing New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022), the Circuit Court of the Second Circuit dismissed the charges.

The State challenges Wilson's standing.  The State says Wilson did not bother to apply for a carry license and thereby satisfy HRS § 134-9 (2011), Hawai'i's license to carry law.  So he can't bring a Bruen-based constitutional challenge to HRS § 134-25 and § 134-27.

Wilson believes otherwise.  He says HRS § 134-25(a) and § 134-27(a) subvert his new constitutional right to protect himself in public by carrying a lethal weapon.  Hawai'i's place to keep laws violate the Second Amendment to the United States Constitution and its counterpart, article I, section 17 of the Hawai'i Constitution.

Because the State charged Wilson with place to keep offenses, we conclude that Wilson has standing to challenge the constitutionality of those laws.  A criminal defendant has standing to level a constitutional attack against the charged

2

crime.  See State v. Armitage, 132 Hawai'i 36, 55, 319 P.3d 1044, 1063 (2014).

Wilson though lacks standing to confront HRS § 134-9 (licenses to carry).  The State does not charge him with violating HRS § 134-9 (it's not a crime), and Wilson made no attempt to obtain a carry license.

We reject Wilson's constitutional challenges.  Conventional interpretive modalities and Hawai'i's historical tradition of firearm regulation rule out an individual right to keep and bear arms under the Hawai'i Constitution.  In Hawai'i, there is no state constitutional right to carry a firearm in public.

Bruen snubs federalism principles.  Still, the United States Supreme Court does not strip states of all sovereignty to pass traditional police power laws designed to protect people. Wilson has standing to challenge HRS § 134-25(a) and § 134-27(a).  But those laws do not violate his federal constitutional rights.

## II.

### A.    Charges and Alleged Facts

In December 2017, the County of Maui Department of the Prosecuting Attorney charged Christopher Wilson by felony information.  He allegedly violated: (1) HRS § 134-25(a) place to keep firearm, (2) HRS § 134-27(a) place to keep ammunition, (3) HRS § 134-2 (2011 & Supp. 2017) permit to acquire ownership

of a firearm, and (4) HRS § 708-813(1)(b) (2014 & Supp. 2015), first degree criminal trespass.

The facts are slim. Declarations and police reports submitted to support the parties' position for the motion to dismiss comprise the factual record.

In December 2017, at about 11:00 p.m., Flyin Hawaiian Zipline owner Duane Ting saw men on his fenced-in property via video surveillance. Ting reported the matter to the Maui Police Department. Officers headed to Ting's property. Meanwhile Ting, driving an all-terrain vehicle, corralled Wilson and his three companions. Armed with an AR-15 assault rifle, he detained them until the police arrived. Then Wilson volunteered to the officers: "I have a weapon in my front waist band." The police lifted his shirt. Wilson had a Phoenix Arms .22 LR caliber pistol, loaded with ten rounds of .22 caliber ammunition. A records check reported that the pistol was unregistered in Hawai'i, and Wilson had not obtained or applied for a permit to own a handgun. Wilson told the police that he legally bought the gun in Florida in 2013.

## B. Wilson's Motions to Dismiss

In May 2021, Wilson moved to dismiss counts 1 and 2. Citing District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010), Wilson argued that prosecuting him for possessing a firearm for self-

defense purposes outside his home violated his right to bear arms under the Second Amendment to the United States Constitution and article I, section 17 of the Hawai'i Constitution.

The State opposed the motion. It presented records from Florida and the Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives to refute Wilson's remark about when and where he had purchased the gun. The records showed: (1) Wilson had not applied for or been issued a concealed weapon or firearm license pursuant to Florida law, and (2) in April 2011 someone not named Christopher Wilson purchased the pistol from a licensed firearms dealer in Florida.

The circuit court denied Wilson's motion to dismiss in July 2021. It relied on Young v. Hawai'i. There, the Ninth Circuit Court of Appeals held that the Second Amendment does not provide a right to openly carry a firearm for self-defense. Young v. Hawai'i, 992 F.3d 765, 821 (9th Cir. 2021), cert. granted, judgment vacated, 142 S. Ct. 2895 (2022), and abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).

In July 2022, Wilson filed a second motion to dismiss counts 1 and 2. Bruen had just come out.

Wilson again challenged the constitutionality of HRS § 134-25(a) and HRS § 134-27(a). His motion declares he carried the

gun solely for "self-defense purposes." He says the place to keep laws violate his right to carry a handgun for self-defense outside his home. Both the United States and Hawai'i Constitutions confer that right. Wilson maintains that HRS § 134-25 and HRS § 134-27 - which confine firearms and ammunition to the "possessor's place of business, residence, or sojourn" - had "no exceptions" for carrying firearms outside the home. Wilson describes these "absolute restrictions" as "out of step" with the "Nation's historical tradition of firearm regulation."

The Maui Department of the Prosecuting Attorney (State) countered.

First, the Second Amendment allows for some restrictions per Heller and Bruen. For instance, registration and permitting are constitutional. Second, unlike the Bruen plaintiffs, Wilson illegally possessed a handgun because he never tried to follow Hawai'i's firearm registration and license to carry law. Because he didn't apply for a permit, he lacks standing to raise a Second Amendment challenge.

Circuit Court Judge Kirstin Hamman granted Wilson's second motion to dismiss in August 2022. HRS § 134-25(a) and § 134-27(a) infringed Wilson's constitutional right to keep and bear a firearm for self-defense.

The court ruled that Wilson had standing to challenge HRS § 134-25(a) and § 134-27(a).  Then it concluded that per Bruen, a right to keep and bear firearms for self-defense under the Hawai'i and United States Constitutions extends "outside the home."  The State had failed to meet its burden to show how HRS § 134-25(a) and § 134-27(a) are "consistent with the Nation's historical tradition of firearm regulation."  The circuit court also found that HRS § 134-25(a) and § 134-27(a) made "no exceptions for carrying firearms outside the home for self-defense purposes."  [There *are* exceptions in those laws - "[e]xcept as provided in sections 134-5 and 134-9."  This mistake though is immaterial to our decision.]

The court dismissed counts 1 and 2 with prejudice.

The State moved to reconsider.  Then the Department of the Attorney General got involved.  The court granted its request to file an amicus brief in support of the Maui Prosecuting Attorney's motion.  The Attorney General argued that Bruen does not stop states from requiring a license before bringing a firearm to a public place.  The circuit court denied the motion to reconsider.

The State appealed.  Then it filed an application for transfer.  We granted the transfer.

**III.**

We hold that the text and purpose of the Hawai'i Constitution, and Hawai'i's historical tradition of firearm regulation, do not support a constitutional right to carry deadly weapons in public.

We conclude that HRS § 134-25 and § 134-27 do not violate Wilson's right to keep and bear arms under article I, section 17 of the Hawai'i Constitution and the Second Amendment to the United States Constitution. Since Wilson lacks standing to challenge HRS § 134-9, we do not take up his Second Amendment challenge to that law.

**A. Standing**

Wilson has standing. His standing though, is confined to challenging HRS § 134-25 and § 134-27, not HRS § 134-9.

**1. Wilson has standing to challenge HRS § 134-25 and § 134-27**

The State argues Wilson has no standing to challenge Hawai'i's place to keep crimes, HRS § 134-25 (pistol or revolver) and § 134-27 (ammunition). He didn't bother to apply for a carry license and satisfy HRS § 134-9. So he can't attack the licensing law.

The State relies on California and New York cases where courts denied standing to criminal defendants who did not try to get a license to carry. They could not bring Bruen-based

8

constitutional challenges.  See, e.g., People v. Rodriguez, 171 N.Y.S.3d 802, 806 (N.Y. Sup. Ct. 2022) ("Failing to seek a license before roaming the streets with a loaded firearm is not abiding by the law, and nothing in the Second Amendment requires that it be tolerated."); People v. Velez, 302 Cal. Rptr. 3d 88, 106 (Cal. Ct. App. 2022) ("[U]nlike the petitioners in Bruen, the record does not show, nor does [defendant] claim, that he applied for and was denied a license to possess the gun in question.").

Hawai'i law offers criminal defendants broad standing to challenge the constitutionality of criminal laws they are charged with violating.  State v. Grahovac, 52 Haw. 527, 532, 480 P.2d 148, 152 (1971).  It allows challenges "[w]here restraints imposed act directly on an individual or entity and a claim of specific present objective harm is presented."  State v. Bloss, 64 Haw. 148, 151, 637 P.2d 1117, 1121 (1981).

Here, the State charges place to keep crimes.  Because Wilson faces serious consequences, he has *a claim of specific present objective harm.*  And this gives him standing to challenge the constitutionality of HRS § 134-25 and § 134-27.  See Armitage, 132 Hawai'i at 55, 319 P.3d at 1063 (defendants subject to penal liability under a regulation have "a claim of specific present objective harm," and therefore standing to

challenge the constitutionality of that regulation) (citation omitted).

### 2. Wilson lacks standing to challenge HRS § 134-9

Unlike his challenges to HRS § 134-25 and § 134-27, Wilson does not have standing to challenge HRS § 134-9's constitutionality.

Wilson says HRS § 134-9 "may be unconstitutional" and that it is unreasonable to "[r]equire[] defendants to apply for licenses pursuant [to] a potentially unconstitutional statute as a prerequisite to challenging other statutes[.]" HRS § 134-9 is unconstitutional, Wilson's argument goes, so he should not have to apply for a license to challenge the law.

We disagree. Wilson has no standing to challenge HRS § 134-9 without applying for a license.

First, the State has not charged Wilson with violating HRS § 134-9. Since "a criminal defendant cannot challenge the constitutionality of one subsection of a statute where he was charged under a different subsection," a criminal defendant cannot challenge the constitutionality of an entirely different statute. Armitage, 132 Hawai'i at 55, 319 P.3d at 1063; see also Grahovac, 52 Haw. at 532, 480 P.3d at 152 ("a criminally accused has 'standing' to constitutionally challenge *only the specific penal sanctions*" charged (emphasis added)).

10

Next, HRS § 134-9 – Licenses to Carry - is not a criminal offense. It reads, in part: "No person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with sections 134-5(c) or 134-25." Nowhere does HRS chapter 134 identify a criminal penalty for HRS § 134-9. And the reference to HRS § 134-25, the B felony place to keep handgun offense, signals *that* crime covers it.

Last, Wilson did not bother to follow HRS § 134-9's procedure to obtain a license to carry. Because Wilson made no attempt to get a license, he cannot claim the law's application procedures are unconstitutional as applied to him. Armitage, 132 Hawai'i at 55–56, 319 P.3d at 1063–64 (defendants lacked standing because they did not follow a permit application procedure, and therefore could not "claim that the specifics of the application procedures . . . [were] unconstitutional as applied to them").

Wilson cannot show a specific present objective harm based on HRS § 134-9. Thus, his constitutional challenges are confined to HRS § 134-25 and § 134-27. Had Wilson followed the HRS § 134-9 application process, and been denied, then he might have standing to challenge that law's constitutionality in his criminal case. But those are not his facts. So Wilson's challenge is limited to HRS § 134-25 and § 134-27.

**B.  HRS § 134-25(a) and § 134-27(a) do not violate Wilson's right to keep and bear arms under article I, section 17**

**1.  Our Sequence of State Constitutional Interpretation**

Wilson invokes both the Hawai'i and United States Constitutions.

This court has yet to explain how we interpret matching state and federal constitutional provisions when both are in play.  Do we look at the state constitution first?  The federal constitution first?  Both?  If we interpret our constitution to provide more protection, do we even take up the federal constitution?

We believe that the proper sequence to consider matching constitutional text is to interpret the Hawai'i Constitution before its federal counterpart.  Only if the Hawai'i Constitution does not reach the minimum protection provided by a parallel federal constitutional right should this court construe the federal analogue.

Thus, we interpret the Hawai'i Constitution first.  And may not get to the United States Constitution. See State v. Kono, 152 A.3d 1, 29 n.29 (Conn. 2016) ("If we address the state constitutional claim first and decide it in favor of the defendant, there is no reason to address the federal constitutional claim; for purposes of that case, the defendant is entitled to prevail under the state constitution, and it

simply does not matter which way the claim would have been decided under the federal constitution."); State v. Moylett, 836 P.2d 1329, 1332 (Or. 1992) ("if no state law, including the state constitution, resolves the issues, courts then should turn for assistance to the Constitution of the United States").

The Hawai'i Constitution often offers "greater protections" than the federal constitution.  State v. Santiago, 53 Haw. 254, 265, 492 P.2d 657, 664 (1971).  When the two contain look-alike provisions, Hawai'i has chosen not to lockstep with the Supreme Court's interpretation of the federal constitution.

Rather, this court frequently walks another way.  Long ago, the Hawai'i Supreme Court announced that an "opinion of the United States Supreme Court . . . is merely another source of authority, admittedly to be afforded respectful consideration, but which we are free to accept or reject in establishing the outer limits of protection afforded by . . . the Hawai'i Constitution."  State v. Kaluna, 55 Haw. 361, 369 n.6, 520 P.2d 51, 58 n.6 (1974).  Further, "this court has not hesitated to adopt the dissents in U.S. Supreme Court cases when it was believed the dissent was better reasoned than the majority opinion."  State v. Mundon, 129 Hawai'i 1, 18 n.25, 292 P.3d 205, 222 n.25 (2012).

Interpreting the Hawai'i Constitution is this court's #1 responsibility.  So we reason independently, untethered from the

13

Supreme Court's analysis of the United States Constitution.

State v. Texeira, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2
(1967).  Hawai'i's people "are entitled to an independent
interpretation of State constitutional guarantees."  See State
v. Ball, 471 A.2d 347, 350 (N.H. 1983).  That means this court,
not the U.S. Supreme Court, drives interpretation of the Hawai'i
Constitution.  "If we ignore this duty, we fail to live up to
our oath" to defend Hawai'i's Constitution.  Id.

State constitutions have a distinct role under our nation's
system of federalism.  Deciding a case first on state
constitutional grounds respects state sovereignty and aligns
with a key constitutional design feature – subnational
governance.  As the Oregon Supreme Court put it:

> The proper sequence is to analyze the state's law,
> including its constitutional law, before reaching a federal
> constitutional claim.  This is required, not for the sake
> either of parochialism or of style, but because the state
> does not deny any right claimed under the federal
> Constitution when the claim before the court in fact is
> fully met by state law.

Sterling v. Cupp, 625 P.2d 123, 126 (Or. 1981) (en banc).

The state-constitution-first approach recognizes the states
as the cradle of rights.  State constitutions predated the
Constitution as the original sources of constitutional rights.
Hans A. Linde, First Things First: Rediscovering the States'
Bills of Rights, 9 U. Balt. L. Rev. 379, 380 (1980) ("State
bills of rights are first in two senses: first in time and first

14

in logic."). The Bill of Rights cut and pasted rights first ensconced in pre-1789 state constitutions. Id. at 381. And for more than a century, state constitutional rights were the *only* rights enforceable against state governments. See Gitlow v. New York, 268 U.S. 652, 666 (1925) (incorporating the Bill of Rights against subnational actors).

State constitutions provide a "double security" for the people's liberty. The Federalist No. 51, at 321 (James Madison) (Isaac Kramnick ed., 1987). Per the Constitution's design, the Hawai'i Constitution supplies an *additional* guarantee of individual rights. See, e.g., State v. Tanaka, 67 Haw. 658, 661, 701 P.2d 1274, 1276 (1985) ("We have not hesitated in the past to extend the protections of the Hawai'i Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted.").

But federalism is about more than just the relationship between state and federal governments. "[W]e must not forget that the virtue of federalism lies not in the means of permitting state experimentation but in the ends of expanded liberty, equality, and human dignity." State v. Short, 851 N.W.2d 474, 507 (Iowa 2014) (Cady, C.J., concurring specially).

We honor the Hawai'i Constitution's freestanding vitality. We interpret the Hawai'i Constitution first.

15

### 2. Wilson's Constitutional Claims

Wilson argues that HRS § 134-25(a) and § 134-27(a) violate his putative right to keep and bear arms under article I, section 17 of the Hawaiʻi Constitution and the Second Amendment's brand-new right to bear arms in public for self-defense.

HRS § 134-25(a) and § 134-27(a) criminalize the carrying of "a loaded . . . pistol or revolver" and "ammunition" "[e]xcept as provided in sections 134-5 and 134-9[.]" HRS § 134-9 permits the *licensed* carry of firearms outside the home. Thus, HRS § 134-25(a) and § 134-27(a) regulate firearm use by restricting the right to publicly carry a handgun and ammunition for self-defense purposes to those who apply for and receive a carry license.

Wilson possessed an unlicensed, concealed, and loaded handgun to, he says, protect himself. Only certain factual circumstances justify shooting another human in Hawaiʻi. Per HRS § 703-304(2), "[t]he use of deadly force is justifiable . . . if the actor believes that deadly force is necessary to protect [themself] against death, serious bodily injury, kidnapping, rape, or forcible sodomy." HRS § 703-304(2) (2014).

The State argues Wilson's handgun-toting conduct is not saved by the right to bear arms. He trespassed, a crime. He's not "law abiding." The State's position makes sense in the abstract. Neither Bruen, nor any case, protect a right to

16

commit a crime while armed.  See People v. Gonzalez, 291 Cal. Rptr. 3d 127, 130 (Cal. Ct. App. 2022) ("We are aware of no court decision holding that the United States Constitution protects a right to carry a gun while simultaneously engaging in criminal conduct."); United States v. Perez-Garcia, No. 22-CR-1581-GPC, 2022 WL 17477918, at *3 (S.D. Cal. Dec. 6, 2022) ("[A] reasonable interpretation of Bruen is that it does not obfuscate the requirement that, as a threshold matter, to receive Second Amendment protection, one must first and foremost be law abiding.").

The State's argument about Wilson's alleged criminal conduct does not apply.  Wilson's criminal trespass charge (count 4) is not before this court.  And it's a trial matter. The parties dispute the facts in declarations attached to their motion to dismiss briefing.  These declarations are fair game for now.  They comply with Hawai'i Rules of Penal Procedure Rule 47(a) ("If a motion requires the consideration of facts not appearing of record, it shall be supported by affidavit or declaration.").

Wilson denies trespassing.  Wilson says that he and his friends "were hiking that night to look at the moon and Native Hawaiian plants."  They did not see any "No Trespassing" signs. For purposes of the motion to dismiss, Wilson's alleged criminal

17

conduct does not prevent him from challenging the charges under the Second Amendment and article I, section 17.

So we go to Wilson's article I, section 17 constitutional challenge.

This court eyed article I, section 17 before. See State v. Mendoza, 82 Hawai'i 143, 920 P.2d 357 (1996). But Mendoza dodged the key question: Does Hawai'i's Constitution afford a personal right or a collective right to keep and bear arms?

Mendoza appealed from his conviction for unlawful firearm possession (then an HRS § 134-4(b) (1993) place to keep charge). The law violated his right to bear arms under the state and federal constitutions, he argued. Id. at 144, 920 P.2d at 358. After some textual and historical analysis, this court chose not to decide: "it is unnecessary for us to decide whether the framers intended to establish an individual or collective right to bear arms under article I, section 17." Id. at 153, 920 P.2d at 367. The Mendoza court upheld the firearms regulation, even "[a]ssuming, without deciding, that article I, section 17 established an individual right to bear arms." Id.

Justice Levinson concurred. He concluded that there was no individual right. Article I, section 17 covers conduct with a "reasonable relationship to the preservation or efficiency of a well regulated militia." Id. at 155, 920 P.2d at 369 (Levinson,

18

J., concurring) (cleaned up).  Here, we decide the constitutional question previously sidestepped.

Because the text of article I, section 17, its purpose, and Hawai'i's historical tradition of weapons regulation support a collective, militia meaning, we hold that the Hawai'i Constitution does not afford a right to carry firearms in public places for self-defense.

### 3.   Article I, section 17's text

Article I, section 17 reads:

> A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed.

Haw. Const. art. I, § 17.

The Second Amendment is nearly identical.  Only two commas and three capital letters separate the two.  The Second Amendment reads:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend II.

Since article I, section 17 imitates the Second Amendment, it is helpful to look at what the Second Amendment's words mean.

A textual approach to constitutional interpretation appreciates that words appear (or do not) for a reason.

Both clauses of article I, section 17 and the Second Amendment use military-tinged language – "well regulated

militia" and "bear arms" - to limit the use of deadly weapons to a military purpose.

In contrast, there are no words that mention a personal right to possess lethal weapons in public places for possible self-defense.

First, we examine the prefatory clause to article I, section 17 and the Second Amendment. The opening words carry a military meaning. The "well regulated militia" clause warms up the rest, defining the text. It "sets forth the object of the Amendment and informs the meaning of the remainder of its text." Heller, 554 U.S. at 643 (Stevens, J., dissenting).

Article I, section 17's first clause offers context and clarity, like preambles do. "It cannot be presumed that any clause in the constitution is intended to be without effect." See Marbury v. Madison, 5 U.S. 137, 174 (1803).

The federal constitution deploys "militia" to mean an irregular state military force that may be called up by the federal government to combat outside invasions or internal insurrections. See Silveira v. Lockyer, 312 F.3d 1052, 1070 (9th Cir. 2002); Paul Finkelman, "A Well Regulated Militia": The Second Amendment in Historical Perspective, 76 Chi.-Kent L. Rev. 195, 209 (2000). Article I, section 8 gives Congress power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," and to

"provide for organizing, arming, and disciplining, the Militia." U.S. Const. art. I, § 8, cl. 15-16.  Article II makes the President of the United States the "Commander in Chief of the Army and Navy" and "of the Militia of the several States, when called into the actual Service of the United States."  Id. art. II, § 2, cl. 1.

Founding era dictionaries agree.  See Thomas Dyche & William Pardon, A New General English Dictionary (1765) ("Militia: the civil defence of a kingdom, who are cantoned into companies, regiments, &c. that are casually raised out of the inhabitants upon extraordinary occasions of riots, tumults, invasions &c. who, as soon as the disturbance is over, return to their respective habitations and employments"); John Ash, The New and Complete Dictionary of the English Language (1775) ("Militia: the train bands, the standing military force of a nation.").

To English speakers – in 1791, 1868, and now - the first clause narrows the right that the second clause confers.  It is "the people" who make up the militia that need to "keep and bear arms" to protect "the free state."

Centuries ago, the right to keep and bear arms was not universal.  It wasn't for all.  "The people" who had the right to "keep and bear arms" included a discrete subset, one that excluded people based on gender and race.  Only able-bodied free

21

men could join a militia.  See, e.g., Militia Act of 1792, ch. 33, 1 Stat. 271, 271 (1792) (repealed 1903) (limiting enrollment in the militia to every "free able-bodied white male citizen" that is over "the age of eighteen years, and under the age of forty-five years").

Article I, section 17's second clause also carries an "obvious purpose."  United States v. Miller, 307 U.S. 174, 178 (1939).  "The term 'bear arms' is a familiar idiom; when used unadorned by any additional words, its meaning is 'to serve as a soldier, do military service, fight.'"  Heller, 554 U.S. at 646 (Stevens, J., dissenting) (citing 1 Oxford English Dictionary 634 (2d ed. 1989).  "Bear arms" is "to serve as a soldier." Webster's New International Dictionary (2d ed. 1960).

Before article I, section 17, bear arms had the same meaning, going way back.  Some textualists champion corpus linguistics, "an analysis of how particular combinations of words are used in a vast database of English prose."  Facebook, Inc. v. Duguid, 592 U.S. 395, 412 (2021) (Alito, J., concurring).  They see it as "an important tool . . . in figuring out the meaning of a term."  Wilson v. Safelite Grp., Inc., 930 F.3d 429, 442 (6th Cir. 2019) (Thapar, J., concurring).

Like the first clause's "well regulated militia," the second clause's "bear arms" has a collective, military meaning.

22

Linguistic experts have churned through historical materials, like the Corpus of Founding Era American English and the Corpus of Early Modern English, to get to the bottom of the Second Amendment's key words.  "Founding-era sources almost always use *bear arms* in an unambiguously military sense."  See Dennis Baron, Corpus Evidence Illuminates the Meaning of Bear Arms, 46 Hastings Const. L.Q. 509, 510 (2019).  "Non-military uses of *bear arm*s in reference to hunting or personal self-defense are not just rare, they are almost nonexistent."  Id. at 510-11; see also James C. Phillips & Josh Blackman, Corpus Linguistics and Heller, 56 Wake Forest L. Rev. 609, 674, (2021) ("The overwhelming majority of *bear arms* was the 'collective/militia' sense.")

Judges interpret words as part of the job.  But judges are not language and speech specialists.  Before Bruen, linguists informed the Supreme Court about their research: "[C]orpus linguistics researchers have unearthed a wealth of new evidence over the past decade showing that the phrase 'keep and bear arms' overwhelmingly had a collective, militaristic meaning at the Founding."  See Brief for Corpus Linguistics Professors and Experts as Amici Curiae Supporting Respondents at 4, N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York, 590 U.S. ____, 140 S. Ct. 1525 (2020) (No. 18-280).

No words in article I, section 17 and the Second Amendment describe an individual right.  No words mention self-defense.

"Bear arms" reads the text.  "The *unmodified* use of 'bear arms,' . . . refers most naturally to a military purpose, as evidenced by its use in literally dozens of contemporary texts.  The absence of any reference to civilian uses of weapons tailors the text of the Amendment to the purpose identified in its preamble."  Heller, 554 U.S. at 647-48 (Stevens, J., dissenting) (footnote omitted).

The Hawai'i Constitution leaves out an individual right to bear arms.  Our framers had options.  They could have worded the constitution to plainly secure an individual right to possess deadly weapons for self-defense.  But they didn't.  The Pennsylvania Constitution of 1776 did: "the people have a right to bear arms for the defence *of themselves* and the state."  Pa. Const. of 1776, article XIII (emphasis added).  The Vermont Constitution, too: "the people have a right to bear arms for the defence *of themselves* and the State."  Vt. Const. ch. 1, art. 16 (enacted 1777, ch. 1, art. 15).

The Hawai'i Constitution and 44 state constitutions identify a right to bear arms.  See Mendoza, 82 Hawai'i at 146 n.5, 920 P.2d at 360 n.5. (counting forty-two other states' "bear arms" provisions).  Two states amended their constitutions post-1996.  See Wis. Const. art. I, § 25 enacted in 1998; Iowa Const. art.

I, § 1A, enacted in 2022. 5 states – California, Maryland, Minnesota, New Jersey, and New York - do not have a Second Amendment counterpart in their constitutions. And besides Hawai'i, only four state constitutions (Alaska, North Carolina, South Carolina, and Virginia) still say "well regulated militia."

Unlike article I, section 17, nearly all state constitutions that recognize a right to keep and bear arms, expressly identify it as a civilian right for personal self-defense. Overwhelmingly, state constitutions use individual-centric language. They recognize a right to bear arms for "any person" or "every citizen." For instance (1) Maine's Constitution: "Every citizen has a right to keep and bear arms and this right shall never be questioned." Me. Const. art. I, § 16 (enacted 1987, after a collective rights interpretation of the original provision, State v. Friel, 508 A.2d 123 (Me. 1986)); (2) Connecticut's Constitution: "Every citizen has a right to bear arms in defense of himself and the state." Conn. Const. art. I, § 15 (enacted 1818, art. I, § 17); and (3) Illinois' Constitution: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. art I, § 22 (enacted 1970).

We believe that if article I, section 17 meant to provide an individual right to carry deadly weapons in public for self-defense, then it would say so.

Until Heller, the Supreme Court had never ruled that the Second Amendment afforded an *individual* right to keep and bear arms. Because the Second Amendment provided a collective right, most states conferred an individual right through their constitutions. Federalism principles allow states to provide broader constitutional protection to their people than the federal constitution. See, e.g., Texeira, 50 Haw. at 142 n.2, 433 P.2d at 597 n.2.

Hawai'i chose to use civic-minded language. Article I, section 17 textually cements the right to bear arms to a well regulated militia. Its words confer a right to "keep and bear arms" only in the context of a "well regulated militia."

Article I, section 17 traces the language of the Second Amendment. Those words do not support a right to possess lethal weapons in public for possible self-defense.

**4.   Article I, section 17's purpose**

The original public purpose of article I, section 17 (and the Second Amendment) also supports a collective, military interpretation.

This court construes the Hawai'i Constitution "with due regard to the intent of the framers and the people adopting it,

26

and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." Hanabusa v. Lingle, 105 Hawai'i 28, 31, 93 P.3d 670, 673 (2004).

We conclude that the authors and ratifiers of the Hawai'i Constitution imagined a collective right. Our understanding aligns with what the Second Amendment meant in 1950 when Hawai'i copied the federal constitution's language. And in 1968 and 1978 when Hawai'i's people kept those words.

Article I, section 17 originated as Proposal Number 3, section 15 (Section 15) as introduced in the Constitutional Convention of Hawai'i of 1950. Debates in Comm. of the Whole on Bill of Rights (Article I), 2 Proceedings of the Constitutional Convention of Hawai'i of 1950, at 10 (1961). Legislative history shows that the first framers of the Hawai'i Constitution had concerns about the potential impact that a bear arms provision would have on existing firearms registration laws, and the state's ability to pass reasonable laws. The committee reports disclose the framer's intent to allow sensible firearms legislation.

> Section 15 incorporates the 2nd Amendment of the Federal Constitution. In adopting this language, it was the intention of the committee that the language should not be construed as to prevent the state legislature from passing legislation imposing reasonable restrictions upon the right of the people to keep and bear arms.

Stand. Comm. Rep. No. 20, in 1 <u>Proceedings of the Constitutional Convention of Hawai'i of 1950</u>, at 164 (1960).

The 1950 Constitutional Convention delegates expressed an intent to preserve the Territory's firearms regulations.  They had foresight, too, reserving the right to later pass laws to ban "modern and excessively lethal weapons . . . ."

> This section incorporates the 2nd Amendment to the Federal Constitution.  Your Committee wishes to make it clear that *this section will not render invalid the existing laws of the Territory*, which will be continued in effect by the State Constitution, relating to the registration, possession and carrying of firearms, *nor will it prevent the legislature from passing other reasonable restrictions on the right to acquire, keep or bear firearms or other weapons, including the power of the legislature to entirely prohibit the possession of such modern and excessively lethal weapons* as machine guns, silencers, bombs, atomic weapons, etc.  Upon this understanding, your Committee recommends the adoption of this section.

Comm. of the Whole Rep. No. 5, in 1 <u>Proceedings of the Constitutional Convention of Hawai'i of 1950</u>, at 303 (emphases added).

The 1968 Constitutional Convention endorsed the Hawai'i Constitution's text and original purpose.  The introduction to a series of Legislative Reference Bureau studies prepared to aid the Convention's delegates explains that article I, section 17 was based on the conventional and traditional interpretation of the Second Amendment.  "The historical background of the Second Amendment indicates that the central concern in the right to bear arms was the right of the states to maintain a militia." <u>Hawai'i Constitutional Convention Studies: Introduction and</u>

28

Article Summaries (Vol. I), at 7 (1968).  The report adds: "The right to bear arms refers explicitly to the militia and is subject to lawful regulation."  Stand. Comm. Rep. No. 55 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 235 (1973).

The 1968 Constitutional Convention's Standing Committee recommended retaining then-Section 15.  The Committee's report clarified:

> The Committee feels that reference must be made to the report of the 1950 Constitutional Convention in order that the people of this State not misconstrue the intent of this section.  The right to bear arms refers explicitly to the militia and is subject to lawful regulation.

Id.

Ten years later, the 1978 Constitutional Convention Studies similarly advised the delegates: "[T]he right to keep and bear arms is one enjoyed collectively by members of a state militia" rather than an individual right.  Hawai'i Constitutional Convention Studies 1978: Introduction and Article Summaries, at 6 (1978).  The study recounts that the "1968 Constitutional Convention, to clear up any confusion left by its predecessor, stressed that section 15 referred only to the collective right to bear arms as a member of the state militia, but did not amend section 15."  Id.

The Hawai'i Constitution's first framers knew about the United States Supreme Court's decision in Miller, 307 U.S. at

29

183. In 1950, at the prepare-for-statehood Constitutional Convention, only 11 years had passed since the unanimous decision in Miller. There the Supreme Court concluded that the Second Amendment's purpose was to preserve an effective state militia:

> [i]n the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

Id. at 178.

When the Hawai'i Constitution was first ratified, courts throughout the nation's history had *always* interpreted and applied the Second Amendment with the militia-centric view expressed in Miller. See, e.g., Cases v. United States, 131 F.2d 916, 921 (1st Cir. 1942) ("The right to keep and bear arms is not a right conferred upon the people by the federal constitution."); United States v. Tot, 131 F.2d 261, 266 (3d Cir. 1942) (finding it "abundantly clear" that the Second Amendment, unlike freedom of speech and freedom of religion, "was not adopted with individual rights in mind, but as a protection for the States in the maintenance of their militia organizations against possible encroachments by the federal power").

This was what everyone thought.  A 1969 law dictionary explained: the "right to bear arms" refers to the militia, "[n]ot a constitutional right to carry weapons on one's person as a civilian."  *Right to bear arms*, Ballentine's Law Dictionary (3d ed. 1969).

State and federal courts had also, with few exceptions, upheld laws regulating firearms use and possession.

Article I, section 17 traces the Second Amendment's language.  The introductory militia language reveals article I, section 17's purpose - preserve the militia to safeguard the security of Hawai'i as a free state.  See Heller, 554 U.S. at 640 (Stevens, J., dissenting) (noting that the prefatory phrase "identifies the preservation of the militia as the Amendment's purpose").

Like article I, section 17, the Second Amendment's original purpose protects a state's right to have a militia.  The framers included the right to keep and bear arms in the federal constitution "in response to their fear that [the] government might disarm the militia, not restrict the common law right of self-defense."  Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 499 (2004).  Madison's writings suggest that the Second Amendment originated from fear of a federal government power grab.  The Second Amendment quelled alarm that the

national government might disarm and disband state militias. Those militias could "oppose" a federal army, Madison wrote, and "would be able to repel the danger" of the federal government. The Federalist No. 46, at 301 (James Madison) (Isaac Kramnick ed., 1987).

That's what they were thinking about long ago. Not someone packing a musket to the wigmaker just in case.

Until recently, the Second Amendment conferred a collective right to bear arms in service to the militia. See Miller, 307 U.S. at 178; Robertson v. Baldwin, 165 U.S. 275, 281-82 (1897). There was no individual federal constitutional right to carry deadly weapons in public places for self-defense. There were only statutory, common law, or state constitutional rights.

Around Miller's time, the state militia was evolving into the National Guard. A 1903 Act created the National Guard. "[T]he regularly enlisted, organized, and uniformed active militia in the several States and Territories . . . whether known and designated as National Guard, militia, or otherwise, shall constitute the organized militia." Act of January 21, 1903, 32 Stat. 775. Then the National Defense Act of 1916 federalized the National Guard. Act of June 3, 1916, 39 Stat. 166. A 1933 amendment to that act established state National Guard units that would simultaneously enlist in the federal National Guard. Act of June 15, 1933, 48 Stat. 153, 159. While

each state can call upon their unit for emergencies, the federal government also retains power to utilize them for national defense. See Perpich v. Dep't of Def., 496 U.S. 334, 351 (1990).

The authors of the Hawai'i Constitution understood the meaning of militia. "Militia" meant "a body of citizens enrolled as a regular military force for periodical instruction, discipline, and drill, but not called into active service except in emergencies." Webster's New International Dictionary (2d ed. 1960). By then it included the state National Guard. At the 1968 constitutional convention, delegate Leland Larson explained, "Section 15, the so-called 'right to bear arms' provision, does not refer to the individual's right, it refers to the militia, to the national guard." Debates in Comm. of the Whole on Bill of Rights (Article I), 2 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 24 (1972); see also William L. Shaw, The Interrelationship of the United States Army and the National Guard, 31 Mil. L. Rev. 39, 44 (1966) (noting that "modern-day sense" of term "militia" includes "National Guard units").

Soon interest groups advanced an individual rights interpretation of the Second Amendment. See Carl T. Bogus, The History and Politics of Second Amendment Scholarship: A Primer, 76 Chi.-Kent L. Rev. 3 (2000).

Former Chief Justice Burger called out that movement. It was:

> one of the greatest pieces of fraud, I repeat the word 'fraud,' on the American public by special interest groups that I've ever seen in my lifetime. The real purpose of the Second Amendment was to ensure that state armies — the militia — would be maintained for the defense of the state. The very language of the Second Amendment refutes any argument that it was intended to guarantee every citizen an unfettered right to any kind of weapon he or she desires.

Silveira v. Lockyer, 312 F.3d 1052, 1063 (9th Cir. 2002) (quoting Warren E. Burger, The Right to Bear Arms, PARADE MAGAZINE, Jan. 14, 1990, at 4).

Circuit courts agreed. There was no individual right. Same as it ever was. See Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995) ("Since [Miller], the lower federal courts have uniformly held that the Second Amendment preserves a collective, rather than individual, right."); Gillespie v. City of Indianapolis, 185 F.3d 693, 710 (7th Cir. 1999). In 2001 though, the Fifth Circuit took a new tact. See United States v. Emerson, 270 F.3d 203, 260 (5th Cir. 2001) (finding that the Second Amendment "protects individual Americans in their right to keep and bear arms whether or not they are a member of a select militia").

Then, the Supreme Court granted cert in Heller. Heller flipped the nation's textual and historical understanding of the Second Amendment. The majority insisted there was "no doubt, on the basis of both text and history, that the Second Amendment

34

conferred an individual right to keep and bear arms." 554 U.S. at 595.

History by historians quickly debunked Heller's history. "If history, and history alone, is what matters, why would the Court not now reconsider Heller in light of these more recently published historical views?" McDonald, 561 U.S. at 916 (Breyer, J., dissenting); United States v. Bullock, ___ F. Supp. 3d ___, 2023 WL 4232309, at *4-*5 (S.D. Miss. 2023) (Reeves, J.) ("[A]n overwhelming majority of historians reject the Supreme Court's most fundamental Second Amendment holding – its 2008 conclusion that the Amendment protects an individual right to bear arms, rather than a collective, Militia-based right.") (cleaned up).

History is prone to misuse. In the Second Amendment cases, the Court distorts and cherry-picks historical evidence. It shrinks, alters, and discards historical facts that don't fit. See Heller, 554 U.S. at 639 (Stevens, J., dissenting); Bruen, 597 U.S. at 112 (Breyer, J., dissenting) ("the numerous justifications that the Court finds for rejecting historical evidence give judges ample tools to pick their friends out of history's crowd").

Bruen unravels durable law. No longer are there the levels of scrutiny and public safety balancing tests long-used by our nation's courts to evaluate firearms laws. Instead, the Court ad-libs a "history-only" standard. See id. at 84.

35

The Supreme Court makes state and federal courts use a fuzzy "history and traditions" test to evaluate laws designed to promote public safety.  It scraps the traditional techniques used by federal and state courts to review laws passed by the People to protect people.  And by turning the test into history and nothing else, it dismantles workable methods to interpret firearms laws.  All to advance a chosen interpretive modality.

Yet only a few years before, the Court had constrained originalism's liberty-reducing tendencies.  The history and tradition of the very old days did not control contemporary American life.  "History and tradition guide and discipline this inquiry but do not set its outer boundaries."  Obergefell v. Hodges, 576 U.S. 644, 664 (2015).

Judges are not historians.  Excavating 18th and 19th century experiences to figure out how old times control 21st century life is not a judge's forte.  "Judges are not historians.  We were not trained as historians.  We practiced law, not history."  Bullock, 2023 WL 4232309, at *4.  Worse, judges may use history to fit their preferred narratives.  "[I]n addition to the risk that [judges] will not understand the materials they are charged to consult, there is the additional risk that they will not conduct a dispassionate examination of the historical evidence and will simply marshal historical anecdotes to achieve what they have already decided is the

preferred outcome." Darrell A.H. Miller, Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second, 122 Yale L.J. 852, 935 (2013).

History is messy. It's not straightforward or fair. It's not made by most. See Melissa Murray, Children of Men: The Roberts Court's Jurisprudence of Masculinity, 60 Hous. L. Rev. 799, 800 (2023) (the current Court "frequently relies [on] moments in which women and people of color were expressly excluded from political participation and deliberation").

Bruen, McDonald, Heller, and other cases show how the Court handpicks history to make its own rules. See Allegheny Reprod. Health Ctr. v. Pennsylvania Dep't of Hum. Servs., ___ A.3d ___, 2024 WL 318389, at *135 (Pa. 2024) (Wecht, J., concurring) ("At the same time that it purported to anchor its holding in American common law, the Dobbs majority engaged in historical fiction, disregarding evidence that undermined its view and ignoring the reproductive autonomy that American women originally exercised – autonomy that included matters of pregnancy, childbirth, and abortion."). "A justice's personal values and ideas about the very old days suddenly control the lives of present and future generations." See City & Cnty. of Honolulu v. Sunoco LP, 153 Hawai'i 326, 361, 537 P.3d 1173, 1208 (2023) (Eddins, J., concurring).

Bruen's command to find an old-days "analogue" undercuts the other branches' responsibility – at the federal, state, and local levels - to preserve public order and solve today's problems.  And it downplays human beings' aptitude for technological advancement.

Time-traveling to 1791 or 1868 to collar how a state regulates lethal weapons – per the Constitution's democratic design - is a dangerous way to look at the federal constitution. The Constitution is not a "suicide pact."  Terminiello v. Chicago, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

We believe it is a misplaced view to think that today's public safety laws must look like laws passed long ago. Smoothbore, muzzle-loaded, and powder-and-ramrod muskets were not exactly useful to colonial era mass murderers.  And life is a bit different now, in a nation with a lot more people, stretching to islands in the Pacific Ocean.

Regulations like storing powder safely, reporting with guns for militia "musters" (weapons inspection), and loyalty oaths are hardly helpful to address contemporary gun violence.  Yet those odd laws have historical and traditional roots. Democratically-vetted laws, though – measures taken by today's citizens to save lives - are mostly out of bounds.

Lethal weapons share little resemblance to weaponry used centuries ago.  A well-trained Revolutionary War soldier could

fire his Brown Bess musket three times a minute.  See, e.g., David S. Lux, Brown Bess, Guns in American Society: A-L 84, 86 (Gregg Lee Carter ed., 2002) ("An effectively trained soldier equipped with [a] smooth-bore musket[] could fire at least three rounds per minute on command.").  The Civil War's muzzle-loading rifled muskets in the Civil War were an improvement on Revolutionary War weapons, but were still plenty slow and difficult to reload.  Earl J. Hess, The Rifle Musket in Civil War Combat: Reality and Myth 4-7 (Univ. of Kansas 2008). Presently, a semi-automatic rifle can fire at least 45 rounds a minute (and up to 300).  See Bevis v. City of Naperville, Ill., 85 F.4th 1175, 1197 (7th Cir. 2023); Id. at 1224 (Brennan, J., dissenting).  Weapons to maximize death differ from those in the eras Bruen tells us to review.

Gun use has changed, too.  A backward-looking approach ignores today's realities.  "In 2019 for every justifiable homicide in the United States involving a gun, guns were used in 30 criminal homicides."  (316 justifiable homicides and 9,610 criminal homicides.)  This ratio does not take into account suicides and fatal unintentional shootings.  See Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use, Violence Policy Center, 1, March 2023, https://vpc.org/studies/justifiable23.pdf [https://perma.cc/PW6G-J5U8].

The United States Supreme Court disables the states' responsibility to protect public safety, reduce gun violence, and safeguard peaceful public movement.  A government by the people works.  Hawaiʻi's legislative branch has passed sensible firearms laws.  And Hawaiʻi's executive branch has enforced those laws.  The most recent available data from the Centers for Disease Control shows that Hawaiʻi has the nation's second-lowest rate of gun deaths per year.  Centers for Disease Control and Prevention, National Center for Health Statistics, Firearm Mortality by State (March 1, 2022) (displaying 2021 data) https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm [https://perma.cc/J7HT-7NXH].

As the world turns, it makes no sense for contemporary society to pledge allegiance to the founding era's culture, realities, laws, and understanding of the Constitution.  "The thing about the old days, they the old days."  *The Wire: Home Rooms* (HBO television broadcast Sept. 24, 2006) (Season Four, Episode Three).

5.   **History and Tradition in Hawaiʻi**

To be clear, history, though not the end all, is useful. See Hawaiʻi State AFL-CIO v. Yoshina, 84 Hawaiʻi 374, 376, 935 P.2d 89, 91 (1997) ("[A] constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was

40

adopted and the history which preceded it.") (cleaned up).  The Hawai'i Supreme Court values history and tradition to aid statutory and constitutional interpretation.  Id.  But unlike the United States Supreme Court, we do not subscribe to an interpretive theory that nothing else matters.

Here, we discuss Hawai'i's historical tradition of regulating weapons.  We try our best.  Judges are not historians.  (Except the rare case of John Papa 'Ī'ī, historian and Associate Justice of the Supreme Court of the Kingdom of Hawai'i from 1848-1864.)  Throughout its history as a sovereign nation and as a Territory, Hawai'i regulated deadly weapons.

History bares article I, section 17's purpose.  Never have Hawai'i's people felt that carrying deadly weapons during daily life is an acceptable or constitutionally protected activity.

In Hawai'i, a state constitutional right to keep and bear arms does not extend to non-militia purposes.

### a.    The Kingdom of Hawai'i's First Law: Ke Kānāwai Māmalahoe and the promotion of public safety

"[A] unified monarchial government of the Hawaiian Islands was established in 1810 under Kamehameha I, the first King of Hawai'i."  S.J. Res. 19, 103d Cong., 107 Stat. 1510 (1993).  King Kamehameha I enacted Hawai'i's first law: Ke Kānāwai Māmalahoe, or "law of the splintered paddle."  See Carol Chang, The Law of the Splintered Paddle: Kānāwai Māmalahoe 14 (1994).

41

The law reflects Kamehameha's personal experience:

> Kamehameha and Ka-hakuʻi paddled to Papaʻi and on to Keaʻau
> in Puna where some men and women were fishing, and a little
> child sat on the back of one of the men.  Seeing them about
> to go away, Kamehameha leaped from his canoe intending to
> catch and kill the men, but they all escaped with the women
> except two men who stayed to protect the man with the
> child.  During the struggle Kamehameha caught his foot in a
> crevice of the rock and was stuck fast; and the fishermen
> beat him over the head with a paddle.  Had it not been that
> one of the men was hampered with the child and their
> ignorance that this was Kamehameha with whom they were
> struggling, Kamehameha would have been killed that day.
> This quarrel was named Ka-lele-iki, and from the striking
> of Kamehameha's head with a paddle came the law of
> Mamala-hoe (Broken paddle) for Kamehameha.

Samuel M. Kamakau, Ruling Chiefs of Hawaiʻi 125-26 (1961):

The law of the splintered paddle promotes public safety:

> E nā kānaka,
> E mālama ʻoukou i ke akua
> A e mālama hoʻi i kānaka nui
> a me kānaka iki;
> E hele ka ʻelemakule,
> ka luahine, a me ke kama
> A moe i ke ala
> ʻaʻohe mea nāna e hoʻopilikia.
> Hewa nō, make.
>
> O my people,
> Honor thy god;
> Respect alike (the rights of)
> men great and humble;
> See to it that our aged,
> our women, and our children
> Lie down to sleep by the roadside
> Without fear of harm.
> Disobey, and die.

Chang, The Law of the Splintered Paddle at 16.

Kamehameha I's law protects all people, "great and humble."

Especially the vulnerable - children and the elderly.  The law

imagines free movement without fear. Living without need to carry a deadly weapon for self-defense.

Article IX, section 10 of the 1978 Hawaiʻi Constitution codifies Ke Kānāwai Māmalahoe:

> The law of the splintered paddle, [kānāwai māmalahoe], decreed by Kamehameha I -- Let every elderly person, woman and child lie by the roadside in safety -- shall be a unique and living symbol of the State's concern for public safety.
>
> The State shall have the power to provide for the safety of the people from crimes against persons and property.

Haw. Const. art. IX, § 10.

Article IX, section 10 provides the people of Hawaiʻi a constitutional right to freely and safely travel in peace and tranquility. To animate this constitutional right, the Hawaiʻi Constitution empowers the State to provide for the "safety of the people from crimes against persons and property."

### b. 1833-1893: Weapons were heavily regulated under Hawaiian Kingdom Law

By the time Kamehameha III became King, foreign nations and their citizens increasingly exposed the islands to deadly weapons. Kamehameha III enacted laws to protect his people from crime. In 1833, the King promulgated a law prohibiting "any person or persons" on shore from possessing a weapon, including any "knife, sword-cane, or any other dangerous weapon." Violators were subject to arrest and punishment by fine or lashings. Translation of the Constitution and Laws of the

Hawaiian Islands, Established in the Rein of Kamehameha III 98
(Lahainaluna, 1842).

Kamehameha III's laws severely punished those who committed crimes with deadly weapons.  Chapter XXXVII outlawed burglary.  It had a harsh sentencing enhancement: ordinary burglary was punished by exile for a period of 3-10 years, but if a burglar had a deadly weapon, then it was "a great crime, and the man committing it shall be condemned to reside on another land till death."  Id. at 93.  Chapter XXXVIII, too.  Any murder committed by use of a weapon was punishable by death.  Id. at 94.

Kamehameha III enacted Hawai'i's first constitution in 1840.  Kamakau, Ruling Chiefs of Hawai'i at 370.  Kamehameha III and his advisors, including the American William Richards, spent years deliberating what the Kingdom of Hawai'i's Constitution would say.  Ralph S. Kuykendall, The Hawaiian Kingdom, 1778-1854 159, 167 (1938).  The 1840 Constitution included the United States Constitution's right to freedom of religion.  Translation of the Constitution and Laws at 10 (1842).  But it left out its "right to bear arms" provision, signaling there was no desire to allow the King's subjects to freely arm themselves.  See id. at 9-16.

Kamehameha III's government revised the Constitution twelve years later.  The 1852 Constitution was in many ways modeled on the United States Constitution and the Declaration of Independence.  Article I declared inalienable rights: life,

liberty, property, and pursuing safety and happiness.

Constitution and Laws of His Majesty Kamehameha III, King of the Hawaiian Islands, Passed by the Nobles and Representatives at Their Session, 1852 3 (1852). Article II enshrined freedom of religion. Article III established freedom of the press. And article IV decreed, "[a]ll men shall have the right, in an orderly and peaceable manner to assemble, *without arms*, to consult upon the common good; give instructions to their Representatives; and to petition the King or the Legislature for a redress of grievances." Id. (emphasis added). The 1852 Constitution contained no right to keep and bear arms. See id. And it explicitly conditioned the right of assembly on being unarmed. There was no right to carry weapons in public.

Hawai'i has a tradition of updating its weapons laws to match changing technology. The Kingdom's 1852 law, "An Act to Prevent the Carrying of Deadly Weapons," expanded the definition of "deadly weapon" to prohibit anyone not authorized by law from carrying "any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon." Id. at 19. The only people allowed to carry arms were Kingdom officials and military officers, but only "when worn for legitimate purposes." Id.

Kamehameha V adopted a new constitution in 1864. Again, the Kingdom of Hawai'i's Constitution left out a right to bear arms. See Haw. Const. of 1864. And again, it protected the

45

right to assemble only "without arms."  Haw. Const. of 1864, art. 4.

A shift in deadly weapons regulation occurred in 1870. Concerned that hunters were destroying Oʻahu's bird population, the Kingdom enacted a firearm licensing law.  <u>Laws of His Majesty Kamehameha V., King of the Hawaiian Islands, Passed by the Legislative Assembly, at its Session, 1870</u> 26 (1870) ("An Act to License the Carrying of Fowling Pieces and Other Fire-arms").  The Minister of Interior could issue hunting licenses for the southern part of Oʻahu.  Without a license, the "use or carry" of hunting guns resulted in fines or imprisonment at hard labor.  <u>Id.</u>

The Kingdom of Hawaiʻi Constitution of 1864 remained in effect until 1887.  Then, a subversive group forced King Kalākaua to sign a new constitution.  Queen Liliʻuokalani recalled that they would have executed her brother, King Kalākaua, had he not signed the "Bayonet Constitution," the Constitution of 1887.  Liliʻuokalani, <u>Hawaiʻi's Story by Hawaiʻi's Queen</u> 181 (1898).  The schemers, mostly American men, omitted a right to bear arms.  <u>See</u> Haw. Const. of 1887; Liliʻuokalani, <u>Hawaiʻi's Story</u> at 355.

### c. 1893-1898: The Provisional Government continued to heavily regulate weapons

In 1893, another armed group forcibly deposed Queen Lili'uokalani, who was crowned after King Kalākaua's death in 1891.  Lili'uokalani, Hawai'i's Story at 209-10, 387.

"A so-called Committee of Safety, a group of professionals and businessmen, with the active assistance of John Stevens, the United States Minister to Hawai'i, acting with the United States Armed Forces, replaced the monarchy with a provisional government."  Rice v. Cayetano, 528 U.S. 495, 504-05 (2000). (100 years later, in 1993, "Congress enacted a joint resolution 'to acknowledge the historic significance of the illegal overthrow of the Kingdom of Hawai'i'" and apologize to Native Hawaiians.  Hawai'i v. Office of Hawaiian Affairs, 556 U.S. 163, 168-69 (2009)).

After the unlawful overthrow, one of the first things the Provisional Government did was end the importation of firearms, ammunitions, or explosives.  See Laws of the Provisional Government of the Hawaiian Islands Passed by the Executive and Advisory Councils Acts 1 to 42 13 (Act 9) (1893).

The next year, the Provisional Government formed the "Republic of Hawai'i."  Lili'uokalani, Hawai'i's Story at 258. Then, on July 4, 1894, they unveiled a new Constitution.  Id. Again, the right to assemble was only "without arms."  Haw.

Const. of 1894, art. IV. Again, there was no analogue to the Second Amendment. See Haw. Const. of 1894.

In 1896, the Republic passed a law that prohibited anyone from carrying or using a firearm in Hawai'i without a license. Laws of the Republic of Hawai'i Passed by the Legislature at its Session, 1896 224 (1896). The law also required registration for every firearm in the islands, even those belonging to police or military members. Id. at 224-25. Anyone possessing an unlicensed firearm was subject to a fine and forfeiting the gun. Id. at 226.

> **d.    1898-1959: The Territorial Government continued to heavily regulate weapons**

In 1898, the United States, by joint resolution of Congress, annexed the Republic of Hawai'i, creating the Territory of Hawai'i. Newlands Resolution, H.R.J. Res. 259, 55th Cong. (1898), 30 Stat. 750.

Though the Hawaiian Islands were now ruled by a subjugating nation, Hawai'i continued its historic tradition of strict weapons regulation.

The year before Bruen, the Ninth Circuit Court of Appeals upheld Hawai'i's regulatory framework for firearms, HRS chapter 134. Young v. Hawai'i, 992 F.3d 765, 773-75 (9th Cir. 2021). Young recounts the history of weapons regulation in Hawai'i through much of the 20th century:

Hawai'i's regulation of dangerous weapons remained in effect after Hawai'i consented to annexation as a U.S. territory in 1898. Under the Newlands Resolution, "[t]he municipal legislation of the Hawaiian Islands . . . not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine." Resolution of July 7, 1898, 30 Stat. 750. See Territory of Hawai'i v. Mankichi, 190 U.S. 197, 209, 23 S. Ct. 787, 47 L.Ed. 1016 (1903). Hawai'i's territorial legislature renewed its 1852 limitations on the carrying of dangerous weapons in a 1905 Act, as amended in 1913. Haw. Rev. Laws, ch. 209, § 3089 (1905), as amended 1913 Haw. Sess. Laws 25, act 22, § 1. Like its predecessors, the 1913 statute made it unlawful to carry deadly weapons unless "authorized by law." Id. The statute imposed civil and criminal penalties on anyone who carried a "deadly weapon" without prior authorization "unless good cause be shown for having such dangerous weapon." Id.

In 1927, Hawai'i implemented its first restriction on firearms specifically, as opposed to restrictions on the broader class of "deadly weapons." In a section entitled "Carrying or keeping small arms by unlicensed person," the law provided:

> Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by [them], and, in the case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Act 206, § 5, 1927 Haw. Sess. Laws 209, 209-211. The 1927 Act, which was modeled in part on the Uniform Firearms Act, required a person to obtain a license to carry a "pistol or revolver concealed upon [their] person or to carry one elsewhere than in [their] home or office." Id. § 7. Carry licenses could be issued by the sheriff or a sitting judge after either had determined that applicant was "suitable . . . to be so licensed." Id. An applicant was deemed "suitable" to carry a firearm upon meeting a citizenship and age requirement and showing a "good reason to fear an injury to [their] person or property, or . . . other proper reason for carrying a pistol or revolver." Id.

49

> In 1933, the Hawai'i legislature further refined its concealed-carry licensing scheme. Act 26, § 8, 1933-1934 Haw. Sess. Laws Spec. Sess. 35, 39. To carry a concealed weapon, the applicant had to demonstrate an "exceptional case" and a "good reason to fear injury to [their] person or property." Id.
>
> The "exceptional case" and "good reason to fear injury" requirements included in the 1933 Act became staples of Hawai'i's future firearm regulations. The Hawai'i legislature included those requirements in its 1961 Act "Relating to Permits to Carry Firearms." Act 163, 1961 Haw. Sess. Laws 215. The 1961 regulations mirrored those in the 1933 statute and required an applicant to demonstrate an "exceptional case" and a "good reason [for the applicant] to fear injury to [their] person or property" before publicly carrying a firearm. Id. § 1. Whereas the 1933 Act only applied to *concealed* carry, however, the 1961 Act announced a new regulatory scheme for *open* carry. An individual seeking to carry a firearm openly in public was required to demonstrate "the urgency of the need" to carry and must be "engaged in the protection of life and property." Id. If the applicant made such a showing and was not otherwise prohibited from possessing a firearm, the chief of police had discretion to grant the carry application. Id. ("[T]he respective chiefs of police may grant a license . . . .").

Id. at 774-75.

No doubt. Hawai'i's historical tradition excludes an individual right to possess weapons. Hawai'i prohibited the public carry of lethal weapons – with no exceptions for licensed weapons – from 1833-1896. Unlicensed public carry of firearms has been illegal from 1896 to the present. Hawai'i has never recognized a right to carry deadly weapons in public; not as a Kingdom, Republic, Territory, or State.

### e. The Aloha Spirit

In Hawai'i, the Aloha Spirit inspires constitutional interpretation. See Sunoco, 153 Hawai'i at 363, 537 P.3d at 1210 (Eddins, J., concurring). When this court exercises "power on

behalf of the people and in fulfillment of [our] responsibilities, obligations, and service to the people" we "may contemplate and reside with the life force and give consideration to the 'Aloha Spirit.'" HRS § 5-7.5(b) (2009).

The spirit of Aloha clashes with a federally-mandated lifestyle that lets citizens walk around with deadly weapons during day-to-day activities.

The history of the Hawaiian Islands does not include a society where armed people move about the community to possibly combat the deadly aims of others. See Haw. Const. art. IX, § 10 ("The law of the splintered paddle . . . shall be a unique and living symbol of the State's concern for public safety.").

The government's interest in reducing firearms violence through reasonable weapons regulations has preserved peace and tranquility in Hawai'i. A free-wheeling right to carry guns in public degrades other constitutional rights.

The right to life, liberty, and the pursuit of happiness, encompasses a right to freely and safely move in peace and tranquility. See Haw. Const. art. I, § 2; Haw. Const. art. IX, § 10. Laws regulating firearms in public preserve ordered liberty and advance these rights.

There is no individual right to keep and bear arms under article I, section 17. So there is no constitutional right to carry a firearm in public for possible self-defense.

51

We hold that HRS § 134-25(a) and § 134-27(a) do not violate Wilson's rights under the Hawai'i Constitution.

**C.  HRS § 134-25(a) and § 134-27(a) do not violate Wilson's right to bear arms under the Second Amendment**

We also hold that HRS § 134-25(a) and § 134-27(a) do not violate the Second Amendment to the United States Constitution. "[T]he right secured by the Second Amendment is not unlimited. . . .  [T]he right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Bruen, 597 U.S. at 21.  States retain the authority to require that individuals have a license before carrying firearms in public.  Id. at 79-80 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."); Antonyuk v. Chiumento, 89 F.4th 271, 312 (2d Cir. 2023) ("Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment.").

HRS § 134-25(a) and § 134-27(a) allow a person to carry a handgun for self-defense outside the home if they have a license issued per HRS § 134-9.  See HRS § 134-25(a) ("Except as provided in sections 134-5 and 134-9, all firearms shall be confined to the possessor's place of business, residence, or

sojourn" (emphasis added)); HRS § 134-27(a) (restricting the possession of ammunition based on HRS § 134-5 and § 134-9).

HRS § 134-25(a) and § 134-27(a) do not graze Wilson's Second Amendment right.  Because he has no standing, Wilson's constitutional challenge to HRS § 134-9, Hawai'i's licensing law, fails.  See supra section III.A.2.

The circuit court erred by dismissing the place to keep offenses, HRS § 134-25 and § 134-27.  Those laws do not violate Wilson's constitutional rights under article I, section 17 or the Second Amendment.

## IV.

We vacate the circuit court's Order Granting Defendant's Motion to Dismiss Counts 1 & 2 and remand to the Circuit Court of the Second Circuit.

Richard B. Rost
for appellant

Benjamin E. Lowenthal
for appellee

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Fa'auuga L. To'oto'o

/s/ Trish K. Morikawa

